IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 122,565

In the Matter of F. WILLIAM CULLINS, District Judge,
*Respondent*.

ORIGINAL PROCEEDING RELATING TO JUDICIAL CONDUCT

Original proceeding in discipline. Opinion filed February 26, 2021. One-year suspension, with conditions for reducing term of suspension.

*Todd N. Thompson*, Examiner, Commission on Judicial Conduct, of Thompson-Hall P.A., of Lawrence, argued the cause and was on the brief for the petitioner.

*Christopher M. Joseph*, of Joseph, Hollander & Craft LLC, of Topeka, argued the cause, and *Carrie E. Parker,* of the same firm, was with him on the briefs for the respondent, and *F. William Cullins*, respondent, argued the cause pro se.

PER CURIAM:  This is a contested proceeding against F. William Cullins (Respondent) relating to his judicial conduct. Respondent is a district judge in the Fourteenth Judicial District, consisting of Montgomery and Chautauqua counties.

Panel A of the Commission on Judicial Qualifications (Commission) held a four-day formal, public hearing, beginning December 9, 2019. After taking the matter under advisement, the panel found Respondent had engaged in conduct which violated the Kansas Code of Judicial Conduct (the Code) as follows:  Canon 1—A judge shall uphold and promote the independence, integrity, and impartiality of the judiciary and shall avoid impropriety and the appearance of impropriety—by violating Canon 1, Rule 1.2 (Promoting Confidence in the Judiciary) (2020 Kan. S. Ct. R. 446); and Canon 2—A judge shall perform the duties of judicial office impartially, competently, and diligently—

1

by violating Canon 2, Rule 2.3 (Bias, Prejudice, and Harassment) and Canon 2, Rule 2.8 (Decorum, Demeanor, and Communication with Jurors) (2020 Kan. S. Ct. R. 448). The panel also found there were areas of great concern, specifically that it was not the "best practice" to take his concerns about procedures in the county attorney's office to the public arena and that it was not appropriate for him to exercise his authority as a judge over nonjudicial officers to perform work on behalf of the court.

The parties had stipulated to certain facts before the formal hearing. Those facts are not in dispute, but Cullins challenges their significance insofar as they apply to the Code.

After the hearing and arguments, the panel made the following findings of fact, conclusions of law, and recommendations:

"FINDINGS OF FACT

"Pursuant to Supreme Court Rule 619(b), the Panel finds that the Examiner has proved the following facts by clear and convincing evidence.

"1.     Respondent frequently used the word 'fuck' and its derivatives when speaking to or near employees and/or others at the courthouse.

"2.     Lance Carter served as a district court clerk in Independence for nearly 12 years. Mr. Carter regularly overheard Respondent's use of obscenities. He created a swear journal documenting multiple instances of Respondent's profanity. Mr. Carter did not intend the swear journal to document all of Respondent's profanity.

"3.     Mr. Carter received an unsatisfactory performance evaluation from a supervisor in August 2015. When Mr. Carter asked Respondent to discuss the evaluation, Respondent called Mr. Carter into Respondent's office and said, 'Carter, go sit down in that fucking chair and don't you say a fucking word.' Respondent proceeded to yell and scream at Mr. Carter, using profanity.

2

"4.     Respondent did not give Mr. Carter an opportunity to address Mr. Carter's concerns about the evaluation. When Mr. Carter tried to speak, Respondent told him, 'Keep your fucking mouth shut. You don't have the right to defend yourself here. Don't say another fucking word. Go see Joni Pratt. Get the fuck out of my sight and shut the fucking door on your way out.' Mr. Carter left the room.

"5.     Joni Pratt started as Chief Clerk of the District Court of Montgomery County in 2015. Ms. Pratt oversaw a remodeling project in the Coffeyville Clerk's Office in October 2016. Part of the remodeling project included new carpeting. One day, Travis Brock and Andre Ysusi were laying carpet in the law library. Ms. Pratt asked the Respondent whether these carpet layers could install some of the extra carpet in the elevators.

"6.     In response to Ms. Pratt's question, Respondent became 'very angry' and told Ms. Pratt that 'he didn't give a fuck about the carpeting and that that wasn't our fucking building' and that she should call the city manager. Ms. Pratt described Respondent's tone as frightening, loud, aggressive and scary.

"7.     After her lunch break, Ms. Pratt approached Respondent and told him she was embarrassed about the incident. Respondent told her, 'If you think I'm going to fucking apologize to you, I'm not.' Three days later Respondent called Ms. Pratt into his office and told her 'I got to thinking about what you said to me, and there's no fucking way that those fucking inmates heard me.' Ms. Pratt told Respondent it was the carpet layers who heard him, not inmates.

"8.     Travis Brock heard Respondent yell at Joni Pratt about laying carpet in the elevator. Mr. Brock heard Respondent say something along the lines of 'F' that, we're not doing that.' Respondent's reaction was 'extreme' under the circumstances. Mr. Brock was so uncomfortable that he put his head down and 'literally crawled back into the room I was working in.'

"9.     In June 2018, Joni Pratt resigned from the clerk's office. She asked Judge Gettler to accompany her to Respondent's office as she tendered her resignation. After she told Respondent that she was giving two weeks' notice of her resignation, she left the office and started walking down the hall. Ms. Pratt heard Respondent yell 'Yahoo.'

3

Judge Gettler heard the outburst. The Panel finds that Respondent knew or should have known that his comment would be overheard by Ms. Pratt and others.

"10.    Former Attorney General Curt Schneider, now a lawyer practicing in Coffeyville, heard Respondent use the terms '"bitch", "cunt", et cetera' in referring to females.

"11.    Mr. Schneider's legal assistant, Ann Rooks, overheard Respondent use profanity. Mr. Schneider had asked Ms. Rooks to call Respondent to enter Mr. Schneider's appearance and request a hearing in a court matter pending before Respondent. Mr. Schneider's testimony about Ms. Rooks' statements was admitted without objection.

"12.    Ms. Rooks memorialized her conversation with Respondent as follows: 'When I called Judge Cullins to set the hearing and told him the names of the parties, he said, "Oh fuck. Them again?" Then he asked if Mr. Schneider represents "the dude or the chick." When I told him Mr. Schneider represents [client], he said, "Oh, fuck . . . really? She's fucking crazy." He then went on to say, "I used to think the guy was ok, but the longer this goes on, I'm starting to think he may be fucking crazy too."' Ms. Rooks' memorandum was admitted without objection.

"13.    Tim Emert, a lawyer from Independence, heard Respondent's use of obscenities so regularly that it was 'just routine.' Mr. Emert heard Respondent use the words 'bitch' and 'cunt' in describing females. Mr. Emert also heard Respondent use both of these words in the same sentence in talking about the same women.

"14.    The Panel is cognizant of a potential discrepancy between the testimony of Mr. Emert and the testimony of attorney Dan Reynolds, of the same firm, on the subject of Respondent's use of the words 'bitch' and 'cunt' in reference to specific women. On the one hand, Mr. Emert testified that Respondent used those terms in a conversation directly with Mr. Emert. On the other hand, Mr. Reynolds testified that Mr. Emert told Mr. Reynolds that Mr. Emert 'heard from another person' that Respondent had used those terms. The panel finds the testimony of both Mr. Emert and Mr. Reynolds highly credible. Based on the evidence presented, including witness demeanor, the panel believes that Respondent in fact used these derogatory terms in a conversation with Mr. Emert, and that either (a) Mr. Reynolds misunderstood what Mr. Emert had told him, or

4

(b) Mr. Emert elected for whatever reason not to reveal to Mr. Reynolds that Mr. Emert was the person who heard Respondent use the words. Mr. Emert's testimony before the Panel was under oath, and accordingly, Mr. Emert was obligated to tell the Panel the whole truth. The Panel is convinced that he did.

"15.     Respondent stipulated that he wrote 'Larry said so doesn't fucking cut it' on a document. The document was an arrest warrant packet prepared by the Office of Montgomery County Attorney Larry Markle. Assistant County Attorney Lisa Montgomery prepared the warrant packet. Montgomery County has two dockets, one in Independence and the other in Coffeyville. Certain traffic cases were assigned to the magistrate judge in Coffeyville.

"16.     Ms. Montgomery sent the arrest warrant packet to the district court clerk's office. Respondent sent the packet back to the Montgomery District Attorney's Office with the following language printed in large print on the front page of the arrest warrant:  'This is a traffic case that needs to be filed in c-ville or I need a better explanation. [signed] Cullins. Larry said so doesn't fucking cut it. [signed] Cullins.' The document has an arrow pointing to Larry with language that says, 'It used too [*sic*]'."

## "CONCLUSIONS OF LAW

"1. RULE 1.2

"Promoting Confidence in the Judiciary

'A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety.'

"Under Rule 1.2 of the Code of Judicial Conduct a judge shall act at all times in a manner that promotes public confidence in the integrity of the judiciary. Public confidence is eroded by a judge's improper conduct. This principle applies to both the professional and personal conduct of a judge. Rule 1.2, Cmt 1 (2019 Kan. S. Ct. R. 441.) 'Integrity' under the Judicial Code includes the qualities of fairness and soundness of

5

character. Conduct that compromises or appears to compromise the integrity of a judge undermines public confidence in the judiciary. Rule 1.2, Cmt 3 (2019 Kan. S. Ct. R. 441.)

"Of great concern to the Panel, Respondent used derogatory words to describe women, such as 'bitch' and 'cunt.'

"In a conversation with Ann Rooks, secretary to attorney Curt Schneider, Respondent stated: 'Oh fuck. Them again.' When advised that Schneider represented the female in the situation, Respondent stated: 'Oh, fuck, really? She's fucking crazy. I used to think the guy was ok, but the longer this goes on, I'm starting to think he may be fucking crazy too.'

"Respondent used expletives and derided Joni Pratt when she asked him questions regarding installing carpet in the elevator. Respondent's conduct was so out of line with appropriate decorum that carpet installer Travis Brock put his head down and attempted to avoid the situation. Respondent yelled 'Yippee' after Ms. Pratt resigned from the county clerk's office.

"Respondent used expletives with anger when speaking with Lance Carter about his employment review. Respondent frequently used the word 'fuck' and its derivatives when speaking to or near employees and others at the courthouse. Respondent's unkind and abusive language to courthouse staff has resulted in unnecessary staff turnover.

"Respondent's violations of Rule 1.2 as described above are established by clear and convincing evidence. The above-described conduct harms public confidence in the integrity of the judiciary. The conduct exhibits unfairness and unsound character. Public confidence has been undermined because of the above-described incidents of Respondent's conduct.

"The Panel has not found, and makes no determination, that a judge's use of ubiquitous profanity will always constitute a violation of Rule 1.2. That is a question for another day. The Panel has simply found that Respondent's conduct described in this section violates Rule 1.2 based on the evidence presented in this proceeding.

6

"2. RULE 2.3

"Bias, Prejudice, and *Harassment*

"(B)      'A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation and shall not permit court staff, court officials or other subject to the judge's direction and control to do so.'

"A. Gender Bias.

"The Panel concludes that Respondent's use of derogatory words directed at women, in particular the words 'bitch' and 'cunt,' manifested a bias and/or prejudice and was hostile toward the individuals about whom he was speaking.

"Respondent's violation of Rule 2.3 is established by clear and convincing evidence. His conduct manifested clear bias based upon sex. Intentionally gender-based derogatory references toward women have no place in the administration of justice, and have no place in a judge's vernacular.

"B. Race Bias.

"At a hearing involving an African-American athlete attending Independence Community College, the Respondent stated, 'Can I assume you're not even a Kansas boy?' At another hearing that same day involving a different African-American athlete, Respondent again inquired where the defendant came from before attending College. When the defendant replied Topeka, Respondent stated, 'At least you're a Kansas fellow, anyway.' Later in the second hearing, Respondent referred to the second defendant as a 'Kansas boy.'

"The Examiner alleged that Respondent's use of the term 'Kansas boy' violated Rule 2.3. Respondent testified that he did not intend the term 'boy' to have any racial

7

connotation. Respondent explained that he considers himself as a 'Chautauqua County boy' and that his reference to the young man as 'a Kansas boy' was in the same vein. This is consistent with the Examiner's allegations, because the Examiner expressly disclaimed any attempt to prove that Respondent's 'boy' reference was driven by race-based animus. Even though the Panel has implicitly found the Respondent's testimony on several other issues to be less worthy of credence than the testimony of other witnesses, the Panel finds Respondent's testimony that he did not intend the term 'boy' to have any racial connotation credible. Based on all of the evidence, the Panel concludes that Respondent intended to use the term 'boy' as term of geographic origin, and not as a term of racial derision. Geographic origin was relevant for proper administration of the bond hearing, and the men were teenagers.

"Despite the Panel's finding that Respondent did not intend any racial derision in his use of the term 'boy,' however, there is clear and convincing evidence that the prosecutor in these criminal cases was concerned that Respondent's use of the term could be interpreted as a term of bias. The prosecutor felt it appropriate to (and did) apologize for Respondent's conduct to the father of one of the defendants.

"The Panel believes that the Supreme Court's sua sponte analysis of Rule 2.3 in *State v. Smith*, 308 Kan. 778, 423 P.3d 530 (2018), compels a finding that Respondent violated Rule 2.3 in his use of the term 'boy' on these facts. The Smith case explains that the focus of the Rule 2.3 inquiry must be on the 'appearance of bias . . . to an informed, objective observer, 'even if that bias does not exist. *Id*. at 788 (quoting *Meija v. United States*, 916 A.2d 900 (D.C. Ct. App. 2007); *see also id.* (quoting *Wang v. Attorney General of the United States*, 423 F.3d 260, 269 (3d Cir. 2005) ('the assurance that the arbiter is not predisposed to find against a person "is absent—and judicial conduct improper—whenever a judge appears biased, even if she is not actually biased."'); Rule 2.3 Comment [1] ('A judge must avoid conduct that may reasonably be perceived as biased.'). The Panel concludes that Respondent's use of the term 'boy' on these facts may reasonably have been perceived as biased—especially to these defendants and their family member(s) in attendance. Indeed, the prosecutor on these matters contemporaneously believed that Respondent's comments may have been perceived as biased and apologized for them. Accordingly, the Panel finds that Respondent's use of the term boy in these hearings violated Rule 2.3.

"3. RULE 2.8

"Decorum, Demeanor, and Communication with Jurors

"'(B) A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials and others with whom the judge deals in an official capacity. . . . '

"Under Rule 2.8, a judge shall be dignified and courteous to lawyers, court staff, court officials and others with whom the judge deals in an official capacity. Respondent uses obscenities, criticizes staff, and tells staff 'don't talk.'

"In sending back the packet of information to the district attorney's office, Respondent used the language, 'This is a traffic case that needs to be filed in c-ville or I need a better explanation. [signed] Cullins. Larry said so doesn't fucking cut it. [signed] Cullins.' Respondent's demeanor contributed to the decisions of Joni Pratt, Lance Carter, and Lynette Phillips to leave their employment with the court.

"Respondent used expletives and derided Joni Pratt when she asked him questions regarding installing carpet in the elevator. Respondent was undignified when he yelled 'Yippee' after Ms. Pratt resigned from the county clerk's office. Respondent used undignified language in discussing the litigants with Ann Rooks on the phone when she was attempting to enter an appearance for Curt Schneider.

"Respondent stipulated to the fact that he used the quoted phrases: 'Sit down. I want you to listen and don't say a word,' and 'No, don't talk,' or something comparable during a meeting when Joni Pratt requested Respondent's assistance with court employees she supervised.

"Respondent acknowledged that he needed a more effective management style.

"Respondent's violations of Rule 2.8 as described above are established by clear and convincing evidence. His conduct was not patient, dignified, or courteous.

9

"4. OTHER ALLEGATIONS.   All other violations of the Judicial Canons alleged by the Examiner in the Notice of Formal Proceedings and the Final Prehearing Order were not established by clear and convincing evidence or did not rise to the level of a violation of the Judicial Code.

"Notwithstanding this, two of the allegations included in the Final Pretrial Order were areas of great concern for the Panel, and the Panel will now discuss these two areas.

"A. Letter to Law Enforcement.

"First, the Panel criticizes Respondent for his actions in a letter he sent to the sheriff's office or police departments in Montgomery County and the cities of Independence, Coffeyville, Caney and Cherryvale. Respondent's letter indicated correctly that the Court was having difficulty in getting the County Attorney's Office to file charges on probable cause arrests in a timely manner. The Panel does not believe Respondent's action amounts to a violation of the Judicial Code, but believes it was not the best practice in this situation to take the Respondent's concerns, as justifiably frustrated as he may have been, to the public arena. Respondent should have known his letter would become public. His letter was ultimately read at a Cherryvale City Council meeting and caused media coverage of a situation that could have been handled without incident through the adoption of local court rules.

"B. Bonding Practices and Research.

"Second, the Panel criticizes Respondent for directing attorneys outside the judicial branch to perform work on behalf of the court. On different occasions, Respondent directed both Larry Markle and Heath Lampson to look into the conduct of bondsmen in the district, as well as relevant statutes, regulations, and judicial authority. As chief judge, Respondent was vested with authority over bondsmen under K.S.A. 22-2806 and 22-2809b. But the exercise of this authority is a judicial function. The Panel believes the authority does not include the power to direct attorneys appearing before the court to conduct research and investigations on behalf of the court.

10

"The Panel concluded that an admonishment or cease and desist disposition was not a sufficient discipline for Respondent's actions in this case. However, the Panel also concluded that removal of Respondent from the Bench is not warranted on these facts. The Panel heard supporting recommendations from attorneys and judicial colleagues regarding Respondent's abilities as a district court judge. Christina Stapp, Court Services Officer in Montgomery County, testified that Respondent ran a 'very efficient' docket and that he was firm and held attorneys appropriately accountable. Daniel Reynolds, an attorney in Independence, testified that Respondent is 'a very good judge' and 'makes a fair determination.'

"Pursuant to Supreme Court Rule 620 (2019 Kan. S. Ct. R. 487), based on the foregoing Findings of Fact and Conclusions of Law, and based on a unanimous vote of all five members participating in the Formal Hearing, the Panel recommends to the Supreme Court of the State of Kansas that Respondent be disciplined for the violations by public censure and that the Supreme Court refrain from making any future appointment of Respondent as a chief judge.

"The Panel also agrees with the recommendations set forth by Acumen Assessments, LLC. After Respondent completed a Multidisciplinary Forensic Fitness to Practice Evaluation administered by Acumen, the assessment professionals set forth in part the following recommendations:

'1. Judge Cullins would benefit from a process of professional coaching in order to build on the insights he came to over the course of the evaluation, and improve his ability to attune to others in interpersonal interactions. He would also benefit from a continued focus on applying the skills he internalized during his participation in a professionalism workshop.

'2. The symptoms of anxiety noted during the present evaluation are likely to return to baseline following the resolution of the current administrative process. It does not appear necessary at this point, but

11

Judge Cullins could seek out a process of individual counseling or psychotherapy in order to manage the acute symptoms that come to his awareness. . . .

'4. We recommend that Judge Cullins focus his professional aspirations on continuing in his current position within the court, and that he not seek out any new leadership or management positions. If he is interested in pursuing such positions, he will need to learn to internalize new skills that would enable him to be a more effective team leader.'

"The Panel recommends that Respondent complete professional coaching of a minimum of 1-2 years as recommended by Acumen and that if he fails to complete the recommended coaching then the Supreme Court should suspend Respondent from his judicial duties."

Respondent filed exceptions to the panel's final hearing report. See Supreme Court Rule 620(e) (2020 Kan. S. Ct. R. 497). Respondent recommends admonishment or cease-and-desist order. The Examiner endorses the panel's findings, conclusions, and recommendations for discipline.

DISCUSSION

A formal complaint against a judge for violations of the Code must specify the charges against the judge and the alleged facts that are the basis for the charges. Supreme Court Rule 615(c) (2020 Kan. S. Ct. R. 492). If no exceptions are filed by a respondent judge to the hearing panel's Findings of Fact and Conclusions of Law, those Findings and Conclusions are conclusive and cannot be challenged by the respondent. Rule 620(d). See *In re Pilshaw*, 286 Kan. 574, 579, 186 P.3d 708 (2008); *In re Robertson*, 280 Kan. 266, 269, 120 P.3d 790 (2005). In such event, only the discipline is at issue.

12

If exceptions to the Findings and Conclusions are filed, those exceptions are reviewed by this court. To sustain the charges in a disciplinary proceeding against a judge, the charges must be proved by clear and convincing evidence. Supreme Court Rule 619(b) (2020 Kan. S. Ct. R. 495). Clear and convincing evidence is evidence that causes the factfinder to believe that the truth of the facts asserted is highly probable. *In re Henderson,* 301 Kan. 412, 422, 343 P.3d 518 (2015) (*Henderson I*); see also *In re Kurth*, 309 Kan. 224, 247-48, 433 P.3d 679 (2019) (in attorney discipline case, clear and convincing evidence causes the factfinder to believe that the truth of the facts asserted is highly probable). In determining whether the charges are supported by clear and convincing evidence, appellate courts do not reweigh evidence or make credibility determinations; the courts merely examine whether the record supports the panel's findings. *In re Comfort*, 284 Kan. 183, 190, 159 P.3d 1011 (2007).

RESPONDENT'S EXCEPTIONS

In this case, the panel received and accepted Stipulated Findings of Fact ("Stipulations") Nos. 1-16. They are not challenged and are conclusively established. Supreme Court Rule 620(d). The panel also made Findings of Fact ("Findings") Nos. 1-16. Pursuant to Supreme Court Rule 620, Respondent takes exception in part to the Findings. Those Findings and exceptions will be discussed in more detail below.

Respondent also takes exception in part to the hearing panel's Conclusions of Law. Specifically, he takes exception to the panel's conclusions concerning his violation of Canon 2, Rule 2.3 (gender bias, reasonable perception of racial bias). He also asserts the panel's analysis of Canon 1, Rule 1.2 (confidence in the judiciary) and Canon 2, Rule 2.8 (decorum, demeanor) "should not be accepted in full." Respondent accepts the panel's conclusions regarding his phone call to Ann Rooks, found to be a violation of Rule 1.2 (promoting confidence in the judiciary), and his written note on a proposed warrant, which was found to be a violation of Rule 2.8. Respondent accepts that the demeanor and

13

decorum he exhibited around the courthouse and in certain interactions with court staff "fell short" of Rule 2.8(B) (patience, dignity, and courtesy) but asserts that it did not implicate Rule 1.2.

Finally, with regard to the subject of the appropriate discipline, the Respondent took exception to the hearing panel's recommendation of discipline and costs.

Respondent's arguments supporting his Exceptions were dispersed throughout his brief and reply brief. For example, in his brief's Table of Contents, he alleged the panel's finding that Cullins used derogatory words when referring to women was not supported by clear and convincing evidence. He also alleged the panel's factual findings regarding a carpet incident were not supported by clear and convincing evidence. Respondent then set forth his own asserted "Statement of Facts."

This is not a re-trial. Unless specific Findings of Fact and Conclusions of Law are specifically challenged, this court accepts them as conclusively established. See Rule 620(d); *Pilshaw*, 286 Kan. at 579. Though arguably the requirement for such specificity is clearer when applied to attorney discipline, the application of the "specific exception rule" is the same for both attorneys and judges. Cf. Rule 212(c) (2020 Kan. S. Ct. R. 259) (for attorneys, any part of the hearing report not "specifically excepted to" shall be deemed admitted).

The discipline in this case, if any, will be based on this court's determination after considering:

(A) Stipulations submitted by the parties, accepted by the panel, and presented to this court without exceptions;

14

(B) The panel's Findings presented to this court without exception, and thus conclusively established;

(C) The panel's Findings presented to this court with exception and found by this court after review of the record to be supported by clear and convincing evidence;

(D) The panel's Conclusions of Law presented to this court without exception;

(E) The panel's Conclusions of Law presented to this court with exception and found by this court after review of the record to be supported by clear and convincing evidence; and

(F) Arguments of the parties.

THE PANEL'S FINDINGS OF FACT

Regarding the status of each Finding, the following is ascertained after painstaking analysis of Respondent's briefs and the record:

"1. Respondent frequently used the word 'fuck' and its derivatives when speaking to or near employees and/or others at the courthouse."

Respondent stipulated to this fact and does not challenge it.

This Finding is conclusively established.

"2. Lance Carter served as a district court clerk in Independence for nearly 12 years. Mr. Carter regularly overheard Respondent's use of obscenities. He created a swear journal documenting multiple instances of Respondent's

15

profanity. Mr. Carter did not intend the swear journal to document all of Respondent's profanity."

No exception.

This Finding is conclusively established.

"3. Mr. Carter received an unsatisfactory performance evaluation from a supervisor in August 2015. When Mr. Carter asked Respondent to discuss the evaluation, Respondent called Mr. Carter into Respondent's office and said, 'Carter, go sit down in that fucking chair and don't you say a fucking word.' Respondent proceeded to yell and scream at Mr. Carter, using profanity."

Regarding the interactions between Carter and Respondent, Respondent offers that he considered Carter a friend and that while he was "too stern" with him during their meeting, he did not initiate the meeting or curse at Carter. He also submits that he was so stern because he wanted Carter to realize it was a very serious meeting and that Carter indeed had issues he needed to improve on. Respondent testified that he thought he could be "gruff" with Carter because Carter himself was also "gruff" but recognizes he made a mistake and overdid it.

A review of the record shows that this Finding required the panel to decide whether Carter's testimony that Respondent cursed was more credible than Respondent's testimony that he did not curse. In light of Respondent's apparent ubiquitous cursing, to which Respondent admitted, we conclude the panel's finding that Respondent cursed during his meeting with Carter is supported by clear and convincing evidence.

The meeting was attended by only Respondent and Carter. Both individuals testified about the tone of Respondent's statements to Carter. After reviewing the record,

16

and considering the panel's ability to review the demeanor of the witnesses, we conclude the panel's finding that Respondent "yelled and screamed" during the meeting, despite Respondent's description of his tone as "stern" or "gruff" during the "closed-door discussion," is supported by clear and convincing evidence.

This Finding is affirmed.

"4. Respondent did not give Mr. Carter an opportunity to address Mr. Carter's concerns about the evaluation. When Mr. Carter tried to speak, Respondent told him, 'Keep your fucking mouth shut. You don't have the right to defend yourself here. Don't say another fucking word. Go see Joni Pratt. Get the fuck out of my sight and shut the fucking door on your way out.' Mr. Carter left the room."

Respondent's exceptions to this Finding are generally set forth with his exceptions concerning the previous finding. Respondent asserts he did not curse but concedes he was "too stern" with Carter during this meeting. Respondent testified that he thought he could be gruff with Carter because Carter himself was also gruff but recognizes he made a mistake and overdid it.

A review of the record shows that this Finding required the panel to decide whether Carter's testimony describing the meeting was more credible than Respondent's testimony about the meeting. The panel heard testimony from the only two people present at the time and decided Carter's testimony was credible, reliable, clear, and convincing. Our review of the record shows this determination is supported by clear and convincing evidence.

This Finding is affirmed.

17

"5. Joni Pratt started as Chief Clerk of the District Court of Montgomery County in 2015. Ms. Pratt oversaw a remodeling project in the Coffeyville Clerk's Office in October 2016. Part of the remodeling project included new carpeting. One day, Travis Brock and Andre Ysusi were laying carpet in the law library. Ms. Pratt asked the Respondent whether these carpet layers could install some of the extra carpet in the elevators."

No exception.

This Finding is conclusively established.

"6. In response to Ms. Pratt's question, Respondent became 'very angry' and told Ms. Pratt that 'he didn't give a fuck about the carpeting and that that wasn't our fucking building' and that she should call the city manager. Ms. Pratt described Respondent's tone as frightening, loud, aggressive and scary."

Respondent admits that he cussed in the initial interaction with Pratt but denies that he cursed her, that his tone was aggressive, or that he yelled at Pratt. He argues that he was irritated with Pratt because she would not let the issue go.

A review of the record shows that this Finding required the panel to decide whether Pratt's testimony describing the encounter was more credible than Respondent's testimony about it. The panel heard testimony from both, was able to ascertain both witnesses' demeanors, and decided Pratt's testimony was more credible and reliable. Our review of the record shows this finding is supported by clear and convincing evidence.

This Finding is affirmed.

18

"7. After her lunch break, Ms. Pratt approached Respondent and told him she was embarrassed about the incident. Respondent told her, 'If you think I'm going to fucking apologize to you, I'm not.' Three days later Respondent called Ms. Pratt into his office and told her 'I got to thinking about what you said to me, and there's no fucking way that those fucking inmates heard me.' Ms. Pratt told Respondent it was the carpet layers who heard him, not inmates."

Respondent denies cussing when Pratt came to his office and claims she did most of the talking. Respondent also points out that Pratt claimed Michelle Stewart (Judge Cullins' former court reporter) could corroborate that he yelled and cussed, while Stewart's testimony was that she did not remember hearing anything other than conversation. Respondent also points out that he did not mean to upset or hurt Pratt with these interactions and while he understood how Pratt was embarrassed, she was also a "uniquely sensitive person."

Initially, we note the Finding does not mention yelling. Stewart's memory of the "conversation" is not inconsistent with Pratt's memory of cursing, given Respondent's admittedly common practice of cursing during conversations. Respondent's denial of cursing while in his chambers would have been considered by the panel.

The panel was able to ascertain both witnesses' demeanors and decided Pratt's testimony was more credible and reliable. Our review of the record shows this finding is supported by clear and convincing evidence.

This Finding is affirmed.

"8. Travis Brock heard Respondent yell at Joni Pratt about laying carpet in the elevator. Mr. Brock heard Respondent say something along the lines of '"F" that, we're not doing that.' Respondent's reaction was 'extreme' under the

circumstances. Mr. Brock was so uncomfortable that he put his head down and 'literally crawled back into the room I was working in.'"

Respondent's exception to this Finding references some apparent inconsistencies between Pratt's testimony and Brock's testimony. (Brock was one of the carpet layers.)

The panel appears to rely on Brock's testimony for this finding, so Pratt's testimony is not at issue. Our review of Brock's testimony shows this finding is supported by clear and convincing evidence.

This Finding is affirmed.

"9. In June 2018, Joni Pratt resigned from the clerk's office. She asked Judge Gettler to accompany her to Respondent's office as she tendered her resignation. After she told Respondent that she was giving two weeks' notice of her resignation, she left the office and started walking down the hall. Ms. Pratt heard Respondent yell 'Yahoo.' Judge Gettler heard the outburst. The panel finds that Respondent knew or should have known that his comment would be overheard by Ms. Pratt and others."

Respondent acknowledges that he was not courteous or professional when he yelled "Yahoo" after Pratt resigned but maintains that he did not mean to hurt her feelings, he did not realize she was around or that she heard it, and he regrets it.

The Finding does not address Respondent's intent or regret. Our record review shows that the outburst was loud enough that Judge Gettler was certain Pratt had probably heard it. Our review of the record shows this finding is supported by clear and convincing evidence.

20

This Finding is affirmed.

"10. Former Attorney General Curt Schneider, now a lawyer practicing in Coffeyville, heard Respondent use the terms '"bitch", "cunt", et cetera' in referring to females."

Respondent takes exception to this Finding for multiple reasons. Our analysis of this Finding will be discussed later in this opinion.

This Finding is affirmed.

"11. Mr. Schneider's legal assistant, Ann Rooks, overheard Respondent use profanity. Mr. Schneider had asked Ms. Rooks to call Respondent to enter Mr. Schneider's appearance and request a hearing in a court matter pending before Respondent. Mr. Schneider's testimony about Ms. Rooks' statements was admitted without objection."

No exception.

This Finding is conclusively established.

"12. Ms. Rooks memorialized her conversation with Respondent as follows: 'When I called Judge Cullins to set the hearing and told him the names of the parties, he said, "Oh fuck. Them again?" Then he asked if Mr. Schneider represents "the dude or the chick." When I told him Mr. Schneider represents [client], he said, "Oh, fuck . . . really? She's fucking crazy." He then went on to say, "I used to think the guy was ok, but the longer this goes on, I'm starting to think he may be fucking crazy too."' Ms. Rooks' memorandum was admitted without objection."

Respondent takes exception only to the extent necessary to allow him to provide record evidence in mitigation but does not dispute that the evidence supports this finding.

This Finding is conclusively established.

"13. Tim Emert, a lawyer from Independence, heard Respondent's use of obscenities so regularly that it was 'just routine.' Mr. Emert heard Respondent use the words 'bitch' and 'cunt' in describing females. Mr. Emert also heard Respondent use both of these words in the same sentence in talking about the same women."

Respondent takes exception to the Finding for multiple reasons. Our analysis of this Finding will be discussed later in this opinion.

This Finding is affirmed.

"14. The Panel is cognizant of a potential discrepancy between the testimony of Mr. Emert and the testimony of attorney Dan Reynolds, of the same firm, on the subject of Respondent's use of the words 'bitch' and 'cunt' in reference to specific women. On the one hand, Mr. Emert testified that Respondent used those terms in a conversation directly with Mr. Emert. On the other hand, Mr. Reynolds testified that Mr. Emert told Mr. Reynolds that Mr. Emert 'heard from another person' that Respondent had used those terms. The panel finds the testimony of both Mr. Emert and Mr. Reynolds highly credible. Based on the evidence presented, including witness demeanor, the panel believes that Respondent in fact used these derogatory terms in a conversation with Mr. Emert, and that either (a) Mr. Reynolds misunderstood what Mr. Emert had told him, or (b) Mr. Emert elected for whatever reason not to reveal to Mr. Reynolds that Mr. Emert was the person who heard Respondent use the words.

22

Mr. Emert's testimony before the panel was under oath, and accordingly, Mr. Emert was obligated to tell the panel the whole truth. The panel is convinced that he did."

Respondent takes exception to this Finding for multiple reasons. Our analysis of this Finding will be discussed later in this opinion.

This Finding is affirmed.

"15. Respondent stipulated that he wrote 'Larry said so doesn't fucking cut it' on a document. The document was an arrest warrant packet prepared by the Office of Montgomery County Attorney Larry Markle. Assistant County Attorney Lisa Montgomery prepared the warrant packet. Montgomery County has two dockets, one in Independence and the other in Coffeyville. Certain traffic cases were assigned to the magistrate judge in Coffeyville."

Respondent takes exception only to the extent necessary to allow him to provide record evidence in mitigation but does not dispute that the evidence supports this finding.

This Finding is conclusively established.

"16. Ms. Montgomery sent the arrest warrant packet to the district court clerk's office. Respondent sent the packet back to the Montgomery District Attorney's Office with the following language printed in large print on the front page of the arrest warrant: 'This is a traffic case that needs to be filed in c-ville or I need a better explanation. [signed] Cullins. Larry said so doesn't fucking cut it. [signed] Cullins.' The document has an arrow pointing to Larry with language that says, 'It used too [*sic*].'"

23

Respondent suggests this Finding must be considered within the context of his justifiable frustration with Larry Markle's practices as county attorney. While such context is appropriate in determining what, if any, discipline is appropriate, it does not constitute an exception to the Finding.

This Finding is conclusively established.

To summarize, our review of the record confirms each excepted Finding of Fact is supported by clear and convincing evidence. Therefore, each excepted Finding is conclusively established. As needed for further explanation and clarification, the facts will be expanded and explained later.

THE PANEL'S CONCLUSIONS OF LAW

CANON 2, RULE 2.3—GENDER BIAS

The panel concluded that Respondent manifested gender bias in violation of Canon 2, Rule 2.3. This conclusion was based on Findings Nos. 10, 13, and 14.

Respondent points out that Schneider did not specify a time period or context for his statement that Respondent used the terms "'bitch', 'cunt', et cetera" in referring to females. Yet, there was no objection as to relevancy, so this court infers the statements were allegedly made at some time *after* the Code applied to Respondent. Respondent also pivots to the testimony of other witnesses who did not hear such slurs, arguing the "weight" of such testimony. The Examiner responds that none were able to refute that Schneider and Emert heard Respondent make the statements, and we will not reweigh the panel's credibility determinations.

Respondent also asserts that Schneider's statements during the hearing were less than convincing because Schneider did not "complain" during his previous deposition that statements were "about" women, as opposed to being made "in front of" women. As Schneider aptly responded, witnesses do not ask deposition questions and the pertinent question apparently was not posed to him.

Respondent claims it is improbable he would have made these derogatory statements to Emert about two court employees known to be close to Emert, when Respondent was not close to Emert. We find that the panel's findings are supported by clear and convincing evidence, especially in light of the panel's reference to witness demeanor, and we will not reweigh the evidence or re-determine witness credibility.

Finally, Respondent asserts that Emert's testimony is refuted by Dan Reynolds, and argues that Emert was confusing his memory of Respondent's statements with his memories of Joni Pratt's statements. We are aware that a witness can be credible and yet provide unreliable information, as suggested in Respondent's reply brief. The quality and quantity of the evidence was presented to the panel and duly considered by it. Upon review of the entire record, the panel's findings are supported by clear and convincing evidence. The court will not set aside the panel's Findings Nos. 10, 13, and 14. They are affirmed.

Turning to his second point on gender bias, Respondent asserts that the statements, even if made, did not violate the Code because they were not made during the performance of judicial duties. He submits this is correct because there is no indication the terms were used "during or in relation to any matter he was adjudicating" nor "made in the performance of [Respondent's] administrative duties."

Respondent interprets "judicial duties," including his administrative duties, too narrowly. While in the courthouse—when court business of every kind was being

25

addressed—Respondent was present in his official capacity as a district judge, and sometimes also as chief judge. A judge does not lose his mantle of authority when he steps out of his chambers into a hallway. A judge's performance of "judicial duties" occurs constantly in the courthouse during the course of any given day. See Canon 1, Rule 1.2 Comments [1] (public confidence in the judiciary is eroded by improper conduct and the appearance of impropriety), [2] (a judge should expect to be under greater scrutiny than other citizens), and [3] (rule is general because it is impossible to list all possible improper conduct). Those duties include the times a judge presides over hearings, completes administrative reports, and evaluates employees, but they also include those occasions when a judge discusses employee performance with attorneys and other staff; admonishes persons waiting in the hall to be quieter so as not to disrupt court proceedings; offers to assist a wandering law enforcement officer who needs an application for search warrant reviewed; directs a member of the public to the right courtroom; addresses a complaint; and deals with innumerable other things that require a judge's professional attention, judgment, and decision throughout the day. The fact that some people did not see bias, or understand it to be such, is insufficient to overrule the panel's conclusion that it did occur—and occurred often enough—to show bias as represented on those occasions.

A minority of the court would find that the Findings of the panel are insufficient to show more than bias against certain females and are not sufficient to show bias against females generally.

CANON 2, RULE 2.3—APPEARANCE OF RACIAL BIAS

In Stipulation No. 11, the parties agreed, "A transcript reflects that Respondent used the phrase 'Kansas boy' to describe two young black men charged with crimes." The panel also added:

"Respondent testified [at the hearing] that he did not intend the term 'boy' to have any racial connotation. Respondent explained that he considers himself as a 'Chautauqua County boy' and that his reference to the young man as 'a Kansas boy' was in the same vein. This is consistent with the Examiner's allegations, because the Examiner expressly disclaimed any attempt to prove that Respondent's 'boy' reference was driven by race-based animus. Even though the Panel has implicitly found the Respondent's testimony on several other issues to be less worthy of credence than the testimony of other witnesses, the Panel finds Respondent's testimony that he did not intend the term 'boy' to have any racial connotation credible. Based on all the evidence, the Panel concludes that Respondent intended to use the term 'boy' as [a] term of geographic origin, and not as a term of racial derision. Geographic origin was relevant for proper administration of the bond hearing, and the men were teenagers.

"Despite the Panel's finding that Respondent did not intend any racial derision in his use of the term 'boy,' however, there is clear and convincing evidence that the prosecutor in these criminal cases was concerned that Respondent's use of the term could be interpreted as a term of bias. The prosecutor felt it appropriate to (and did) apologize for Respondent's conduct to the father of one of the defendants."

The panel then concluded that Respondent violated Canon 2, Rule 2.3 because his statements during those two defendants' bond hearings may reasonably have been perceived as racially biased.

Rule 2.3 states:

"(A) A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice.

"(B) A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, . . . based upon race . . . ." (2020 Kan. S. Ct. R. 449.)

The Comments to Canon 2, Rule 2.3 state:

27

"[2] Examples of manifestations of bias or prejudice include but are not limited to . . . negative stereotyping; . . . [and] suggestions of connections between race . . . and crime, . . . A judge must avoid conduct that may reasonably be perceived as prejudiced or biased." (2020 Kan. S. Ct. R. 449-50.)

Respondent asserts the panel erred in its conclusion that his words could "reasonably be perceived as prejudiced or biased" based on race. In support, he cites the hearing testimony of the prosecutor, who did not "speak of inflection, tone of voice, historical usage of the term, or local custom." Nor did this witness "claim that anything about [respondent's] use of the term specifically suggested racial animus. [The witness] also did not differentiate between asking if someone was a 'Kansas boy' and calling someone 'boy'." Finally, Respondent claims the word ["boy"] "simply violated the rule by which [the witness] abides, which is 'don't use that word with young, black, adult men.'"

Everyone agrees that words and phrases in this context are important. Respondent's assertions to the panel that he meant no racial bias were accepted by the panel and are not contested by either party. Respondent contests only the panel's findings that his words created a reasonable *perception* of bias, which would also violate Canon 2, Rule 2.3.

Respondent's words are not at issue. They are shown, verbatim, in the transcripts of the bond hearings for two defendants. Those words were:

"THE COURT:  All right. Are you employed anywhere?

"THE DEFENDANT:  No, sir.

"THE COURT:  You going to school?

"THE DEFENDANT:  Yes, sir.

28

"THE COURT:  Where do you go to school at?

"THE DEFENDANT:  Independence Community College.

"THE COURT:  You an athlete?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  Of course. I get so tired of seeing you Independence Community College athletes before me—that goes for Coffeyville Community College, too, though ICC is something that I see more regularly than not.

"Can I assume you're not even a Kansas boy?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  That's right. We pay for this community college and they don't even have Kansas boys play their football or their baseball. They invite these people from out of state.

"Where are you from?

"THE DEFENDANT:  North Carolina.

"THE COURT:  From North Carolina to—can I take a wild guess? Did you have a felony record before ICC gave you a scholarship?

"THE DEFENDANT:  No, sir.

"THE COURT:  Juvenile trouble?

"THE DEFENDANT:  (Shaking head.)

"THE COURT:  Really?

29

"THE DEFENDANT:  (Shaking head.)

"THE COURT:  You just started out this big?"

And later, during the hearing for the second man:

"THE COURT: Based on the information I found in the probable cause affidavit, I'm continuing to hold you. The only purpose of this hearing is to set a bond for you.

"You're not from here, are you?

"THE DEFENDANT:  No.

"THE COURT:  Well, [Defendant], it only seems fair that you get the same lecture that [the prior defendant] got. This Court is exceedingly tired of seeing Independence Community College athletes standing in front of the Court for alleged violations of the law, and those alleged violations of the law are always serious.

"Maybe I could stomach it a little bit more—keeping in mind you're only accused of doing this, but it—I see these all the time—might be a little bit easier for me to stomach seeing these cases if I didn't know the mill levy that that college imposes upon everybody in this area, and they use that money to invite athletes from—where are you from?

"THE DEFENDANT:  Topeka, Kansas.

"THE COURT:  Oh, you're from Kansas. I'll take that different. At least you're a Kansas fellow, anyway. It bothers me more if you are out of state and they invite you here to commit crimes.

"So you're a little bit lucky. You have ties to the community given you're a Topeka fellow."

Regardless of inflection, tone, or local custom, this court has little trouble finding there was clear and convincing evidence to support the panel's conclusion that the statements made by Respondent during these bond hearings created a *reasonable perception* of racial bias, in violation of Canon 2, Rule 2.3. Specifically, two adult Black men appeared before the judge during a bond hearing, both presumed innocent of their criminal charges. A reasonable individual might perceive that the following *may* have shown racial bias:

- Something about the defendants' appearance caused the judge to believe they were athletes;

- Something about their appearance caused the judge to assume they were not from the area;

- Something about their appearance caused the judge to question—even disbelieve—one defendant's assertion that he had no felony record; and

- During the judge's comments he used a term—"boy"— that has been used at times in the past as a common and well-known slur against Black men.

When taken altogether and in context, a reasonable perception of bias cannot be denied. As the panel pointed out, even the prosecutor in these cases felt the need to reach out to one defendant's father, assuring him with words along the lines of: "[D]on't think that the use of that language is going to affect the administration of justice in your son's case." This statement by the prosecutor demonstrates exactly why Canon 2, Rule 2.3 is imperative to our judicial system.

Put plainly, our judicial system requires that every person be allowed to present his case with assurance that the arbiter is not predisposed to find against him. "That

assurance is absent—and judicial conduct improper—whenever a judge appears biased, even if she actually is not biased." *Wang v. Attorney Gen. of U.S.*, 423 F.3d 260, 269 (3d Cir. 2005).

> "An insistence on the appearance of neutrality is not some artificial attempt to mask imperfection in the judicial process, but rather an essential means of ensuring the reality of a fair adjudication. Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself." *Williams v. Pennsylvania*, 579 U.S.__ , 136 S. Ct. 1899, 1909, 195 L. Ed. 2d 132 (2016).

The Findings and Conclusions of the panel on this issue are affirmed.

CANON 2, RULE 2.8—DECORUM, DEMEANOR

Respondent concedes there is clear and convincing evidence for the panel's conclusion that he violated this rule in certain interactions with lawyers and court staff. He admits his "language and conduct" violated Canon 2, Rule 2.8(B) which states: "A judge shall be patient, dignified, and courteous to . . . lawyers, court staff, court officials, and others with whom the judge deals in an official capacity . . . ." (2020 Kan. S. Ct. R. 452.)

CANON 1, RULE 1.2—CONFIDENCE IN THE JUDICIARY

The panel found by clear and convincing evidence that Respondent violated this rule. Respondent takes exception to this conclusion. He argues Canon 1, Rule 1.2 is not implicated by Respondent's behavior.

Canon 1, Rule 1.2 demands a judge to act at all times—meaning 24 hours a day, 7 days a week, 365 days a year—"in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and

the appearance of impropriety." (2020 Kan. S. Ct. R. 447.) The panel found that the Respondent's conduct harms public confidence in the integrity of the judiciary; that it exhibits unfairness and unsound character; and finally that public confidence has been undermined because of his conduct.

Respondent first argues that Respondent's use of the word "fuck" does not implicate this rule. He asserts the word is used so commonly in the current culture's vernacular that it is now ubiquitous and has nothing to do with character. Citing one of his witnesses and even a dissent in a Kansas Supreme Court case, he claims cussing is so common in Southeast Kansas that the entire region would take offense at the suggestion that the use of the word connotes a negative reflection on an individual's character. He goes so far as to suggest that the very idea reflects only the stereotypical bias of the panel. (He does concede that cursing may be unprofessional and, at times, undignified, but maintains it is error to hold that it means a judge lacks character.)

We agree the use of the word is unprofessional and—almost always—undignified for a judge. But the Respondent misses the panel's point. The panel specifically stated it "has not found, and makes no determination, that a judge's use of ubiquitous profanity will always constitute a violation of Rule 1.2." Rather, the panel "simply found that Respondent's conduct described in [the 'Rooks,' 'carpet,' and 'Carter' incidents, now conclusively established,] violates Canon 1, Rule 1.2 based on the evidence presented in this proceeding." That offensive conduct goes far beyond any undignified and unprofessional use of the word "fuck." Respondent's aggressiveness; his reference to a female litigant as "crazy"; his overt and public humiliation of Pratt; and his loud, angry, and expletive-filled reprimand of Carter all *collectively* provided the basis for the panel's conclusion concerning Respondent's violation of this rule.

Next, Respondent asserts the evidence indicated he was often fair to court staff. While that may be true, good behavior on some—even most—occasions does not

disprove misbehavior on other occasions. Good behavior may be relevant as mitigation for discipline, but it will not override the panel's conclusions concerning the alleged incidents of Code violations. Frankly, good behavior, while commendable in a judge, is also expected. In many ways, the Code is intended to be aspirational, advisory, or even cautionary, but when the "Code uses 'shall' or 'shall not,' binding obligations are imposed, the violation of which can result in disciplinary action." Supreme Court Rule 601B, Scope [5] (2020 Kan. S. Ct. R. 441). This court must first ascertain whether the Code was violated. Mitigating factors will be considered within the context of discipline only if it has been.

Respondent also asserts that his conduct on some occasions do not show "unsound character," as found by the panel. He asserts character is overarching, and general character cannot be found to be unsound because of what could be considered as only temporary lapses in judgment.

Respondent is correct in one sense. He has his own perception of his overall character, and he is entitled to that perception. But he is not the only judge of his character. The panel also must judge it, and that judgment must be based on the evidence presented at the hearing. Both parties had their opportunity to present what they believed to be relevant evidence in this case during the course of a four-day hearing. Based on that, there was enough clear and convincing evidence to conclude that Respondent demonstrated unfairness and "unsound character" for a judge.

Finally, Respondent asserts that Canon 1, Rule 1.2 is not implicated because the incidents at issue did not occur in a public forum, so "public confidence" in the judiciary could not be implicated. On the contrary, the "carpet incident" occurred in a hallway near carpet layers and the "yahoo" was heard in a hallway. Even more obvious, it defies logic to imply that Respondent's conduct has not been discussed in the community by the people who witnessed it.

34

The only remaining issue before us is the appropriate discipline for Respondent's violations. During the hearing before this court, the Examiner recommended that Respondent at least be publicly censured and ordered to follow the conditions recommended by the panel. The hearing panel unanimously recommended that Respondent be disciplined by public censure and that our court refrain from making any future appointment of Respondent as chief judge. Further, the panel recommended Respondent be ordered to comply with recommendations set forth in an evaluation report prepared by Respondent's expert witness, that he be ordered to obtain professional coaching for one to two years, and that failure to fully comply should result in suspension. Respondent recommends private admonition or a letter to cease and desist the behavior demonstrated to be Code violations.

This court views the findings of fact, conclusions of law, and recommendations of a disciplinary panel as advisory only, but it gives the final hearing report the same dignity as a special verdict by a jury or the findings of a trial court. *In re Henderson*, 306 Kan. 62, 72, 392 P.3d 56 (2017) (*Henderson II*). The panel's recommendations do not prevent us from imposing greater or lesser sanctions, as the court may enter any of the dispositions available to us. See Rule 620(f).

Respondent's behavior, as established by the Stipulations, Findings, and Conclusions, has been quite troubling. He has intimidated and publicly humiliated court employees. He has shown bias and the appearance of bias by his insulting and careless remarks, even while on the bench and presiding over hearings. By his coarse language in the courthouse, he has sullied the dignity and propriety of the judiciary.

In mitigation, Respondent offers that he is efficient and fair in his hearings. He does not mean to hurt or harm. He is just "salty."

We conclude an appropriate discipline in this case is Respondent's suspension from sitting as a judge for one year. If Respondent wants us to consider a shorter suspension, he must formulate a plan that will address appropriate counseling and training for Respondent. Counseling must be more frequent than quarterly and should address more than "professional coaching." Training should include instruction on best practices for working with fellow employees, especially those one supervises, and also include workplace issues of harassment, retaliation, and hostile environment. The completed plan must be approved by the Office of Judicial Administration's Director of Personnel, currently Allyson Christman, before it may be presented to this court for consideration. If, after consideration, we approve the plan, then part or all of Respondent's suspension beyond 60 days will be stayed during compliance with the plan. Successful completion of the plan must be certified by the OJA Director of Personnel. If that certification occurs, Respondent's successful completion of the plan, along with the days of suspension served, will be considered by us for possible waiver of Respondent's remaining suspension.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that F. William Cullins be and he is hereby suspended from his judicial duties in the state of Kansas in accordance with Supreme Court Rule 620(f) (2020 Kan. S. Ct. R. 499) for one year, effective on the date of this opinion.

IT IS FURTHER ORDERED that the above suspension will be stayed after 60 days provided Respondent enters into a plan for training and counseling approved by the OJA Director of Personnel. Approval of a plan by that office is required before the stay of Respondent's suspension can commence. If successful completion of the plan is certified by the OJA Director of Personnel, we will consider waiver of any remaining suspension ordered herein.

36

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to Respondent and that this opinion be published in the official Kansas Reports.

CHRISTINA DUNN GYLLENBORG, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  District Judge Gyllenborg was appointed to hear case No. 122,565 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.