IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**FILED**

**May 4, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

January 2023 Term

_____

No. 21-0878

_____

IN THE MATTER OF:

THE HONORABLE C. CARTER WILLIAMS,
Judge of the Twenty-Second Judicial Circuit

_____

JUDICIAL DISCIPLINARY PROCEEDING
Complaint Nos. 78-2021, 81-2021, and 12-2022

SUSPENSION AND OTHER SANCTIONS IMPOSED
_____

Submitted:  February 8, 2023
Filed: May 4, 2023

Teresa A. Tarr, Esq.
Brian J. Lanham, Esq.
Judicial Disciplinary Counsel
Charleston, West Virginia
Counsel for West Virginia Judicial
Investigation Commission

J. Michael Benninger, Esq.
Benninger Law, PLLC
Morgantown, West Virginia

Timothy R. Linkous, Esq.
Linkous Law, PLLC
Morgantown, West Virginia

Counsel for Respondent

CHIEF JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the members of the judiciary and the system of justice." Syllabus, *In the Matter of Gorby*, 176 W.Va. 16, 339 S.E.2d 702 (1985).

2.      "The Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings." Syllabus Point 1, *W. Va. Judicial Inquiry Comm'n v. Dostert*, 165 W.Va. 233, 271 S.E.2d 427 (1980).

3.      ""'Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'" Syllabus Point 4, *In Re Pauley*, 173 W.Va. 228, 235, 314 S.E.2d 391, 399 (1983).' Syllabus Point 1, *Matter of Hey*, 192 W.Va. 221, 452 S.E.2d 24 (1994)."  Syllabus Point 1, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

4.      "Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are

directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and (5) any mitigating or compounding factors which might exist." Syllabus Point 3, *In re Cruickshanks*, 220 W. Va. 513, 648 S.E.2d 19 (2007).

WALKER, Chief Justice:

The Honorable C. Carter Williams has been a circuit court judge in the Twenty-Second Judicial Circuit since 2017. These judicial disciplinary proceedings against him were initiated after he was stopped for a traffic violation in July 2021 by an officer of the Moorefield Police Department, during and after which Respondent identified himself as a judge, contacted the officer's supervisors, including the Chief of Police and the Mayor, and made coercive and retaliatory comments. The West Virginia Judicial Hearing Board (JHB) concluded that Respondent's conduct violated multiple provisions of the Code of Judicial Conduct and the Rules of Professional Conduct and warrants suspension without pay for three months (in the form of a one-year suspension, with nine months stayed), and other sanctions.

Judicial Disciplinary Counsel (JDC) objects to the recommended sanction, contending that the JHB should have found additional violations and that the sanction is too lenient. Respondent also objects, arguing that the JHB's conclusions were not supported by clear and convincing evidence and that the JHB failed to give mitigating factors due consideration. As explained in detail below, we conclude that a six-month suspension without pay is more appropriate to address Respondent's conduct and agree with and impose the JHB's recommendation that Respondent comply with monitoring by the West Virginia Judges and Lawyers Assistance Program (JLAP) for two years, that

1

Respondent be censured and fined $5,000, and that Respondent be required to pay certain costs associated with the disciplinary proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

While JDC and Respondent both generally agree to the underlying facts summarized below, they have diametrically opposed interpretations of those facts. For our purposes, it is challenging that both parties have selectively cited the record to support their competing interpretations, such as seizing on the particular verbiage used in a sworn interview statement, versus what was sworn by affidavit, versus what was said in live testimony, and putting blinders on to the rest. As a result, JDC's argument has not responded to Respondent's arguments and citations to testimony and Respondent is equally unresponsive to JDC's arguments and citations to testimony.

This is a factually complex case because so many individuals and their impressions of Respondent's conduct are involved. And their testimony to the JHB varied either in inconsistent, or incomplete respects, from their earlier, sworn statements. Having conducted an independent review of the record, the following iteration of facts is a fair representation of what the record before us shows as an overall picture and sequence of events and impressions.

Respondent was elected circuit court judge for the Twenty-Second Judicial Circuit (Hampshire, Hardy, and Pendleton counties) in 2016 and took the bench in January

2

2017.  In February 2020, then-Chief Justice Armstead assigned a senior status judge to preside temporarily over Respondent's docket to permit Respondent to see to medical issues.  Respondent returned to work in May 2020.

### A.  *July 11, 2021: Traffic Stop*[1]

On July 11, 2021, Respondent visited an ice cream shop with his family and then left the shop alone, in his own vehicle.  He returned to the shop because he believed he had forgotten his cell phone there but was unable to locate it.  While driving home, he heard something drop and, assuming it to be the missing cell phone, picked it up and transferred it from his left to his right hand while his hands were on the wheel.  Officer Deavonta Johnson observed Respondent with the phone in his hand on the steering wheel and initiated a traffic stop close to 7:30 p.m.  Body cam footage shows that Officer Johnson approached the vehicle, and before Officer Johnson spoke, Respondent asked, "[w]hat's the problem?"  Officer Johnson greeted Respondent, "How you doing, sir, . . . the reason I'm stopping you is . . ." but was interrupted when Respondent said "I'm Judge Williams, and, I don't . . . why are you stopping me?"

Respondent was visibly agitated and attempted to explain to Officer Johnson that he had just picked the phone up from between the door and the seat and was only

---

[1] Both parties agree that the body cam footage is the best evidence of what transpired during the stop and this subsection describes facts gleaned from the video footage, except where, as noted, later sworn statements and/or live testimony (collectively, testimony since the JHB considered both) is necessary for elucidation.

holding it, not using it.  Respondent became more agitated as the conversation continued, and Officer Johnson asked Respondent why he was screaming at him.  The situation escalated when Respondent insisted that he had not done anything wrong and initially refused to provide his license and registration.  Respondent then stated several times that the police are often on their cell phones and not on official business, asking Officer Johnson, "you're never on yours?" in an angry tone.  Officer Johnson again asked why Respondent was yelling.  Respondent then provided his license and registration, his hands and body noticeably shaking.[2]  Respondent then motioned for Officer Johnson to go back to his vehicle and said "go ahead and give me a ticket. Give me a ticket."

When Officer Johnson asked why he was shaking, Respondent answered "I'm irritated because you pulled me over for no reason."  Respondent again attempted to explain that he only had the phone in his hand and likened it to holding a cup.  Respondent then told Officer Johnson, "Give me a ticket. Go ahead." Respondent stated he would take the ticket up to the town office and take it to trial, then said "it's ridiculous, what you're doing." He repeated that officers are on their phones and do not get pulled over, then stated "and don't tell me it's on official business, I hear your cases every day in court.  Go give me a ticket.  Give me a ticket.  I'm really irritated about this whole . . . go ahead and give me a ticket."  Respondent repeated that he had been pulled over for no reason, to which

---

[2] Officer Johnson later questioned whether Respondent was having some sort of medical issue at the time of the stop.

Officer Johnson responded that he had pulled him over because he had a cellphone in his hand.[3] Respondent said several more times for Officer Johnson to give him a ticket and motioned for Officer Johnson to return to his vehicle.

Officer Johnson then returned to his vehicle. There, he confirmed that Respondent's license had expired a few months earlier. While in the vehicle, Officer Johnson received a call from his supervisor, Lieutenant Melody Burrows, whom Respondent had called once Officer Johnson returned to his vehicle. Lt. Burrows, in later testimony and sworn statements, elucidated that on the call Respondent told her that her "boy" had pulled him over, calling Officer Johnson "your boy" several times. Officer Johnson is African-American. Lt. Burrows testified that she knew he was referring to Officer Johnson because she does the scheduling and knew he was the only officer on duty in her department that evening. Lt. Burrows testified that Respondent did not ask her to direct Officer Johnson not to give a ticket, stating "[Respondent] was willing to take the ticket to begin with[,]" but the inference she got from the telephone call was that he did not want the ticket. According to Officer Johnson's testimony (and as can be seen on the body cam footage), Lt. Burrows then called him and asked if Officer Johnson had already written the ticket, and if he had not, not to write it to diffuse the situation.

---

[3] *See* W. Va. Code § 17C-14-15, which prohibits operating a motor vehicle while texting or "using" a cell phone, unless the use is accomplished by hands-free equipment. Respondent does not now dispute that Officer Johnson had reasonable suspicion to stop him, but maintains that there was no probable cause to have charged him.

When Officer Johnson returned to Respondent's vehicle, Respondent was on the phone with Lt. Burrows, who had apparently called Respondent back to let him know that Officer Johnson would not be issuing a ticket.[4] Respondent stated to Officer Johnson, "you can write me a ticket or not, I don't care. I'll take it up to town and we'll go to a trial buddy. That's fine with me. And I'll tell you what, the next time I see any of you on the phone, I'm stopping right there and calling the state police. Any of you." He then repeated that he was only holding his phone and was not using it, offering to Officer Johnson, "you can look." When Officer Johnson asked, "why are you being like this" in response to Respondent's increasingly agitated state, Respondent answered "because I've seen this crap enough and I'm tired of it[,]" grabbing his registration out of Officer Johnson's hand, saying "give it to me. Let me have my license. Now." Officer Johnson then informed him that his license was expired and needed to be renewed. Respondent did not answer but grabbed the license, put his car in gear, and said, "next time I see you . . ." as he drove off.

## B. July 11, 2021: Conduct After the Traffic Stop

Respondent called Lt. Burrows again, around 8:15 p.m. On the call, he told Lt. Burrows that he always sees Moorefield police officers on their phones and that he will call and report it to the state police. Lt. Burrows also testified that Respondent said "he's

---

[4] Lt. Burrows's voice on the call is not intelligible on the body cam footage, but we can ascertain from testimony from Respondent and Lt. Burrows, as well as contextually, that the purpose of the second call was to inform Respondent that she had spoken to Officer Johnson and he would not be issuing a ticket.

never been treated so badly as a Circuit Judge and that he couldn't believe that my boy would – wouldn't take his word for it and why he would lie. He's the Circuit Judge."

Lt. Burrows further testified that during that call Respondent said that Officer Johnson "shouldn't even have his job, that he couldn't believe that we hired him back and brought him back[,]"[5] referencing a wanton endangerment charge issued against Officer Johnson in Mineral County. The charges were dropped, but Officer Johnson was put back on a probationary period with the Moorefield Police.

Lt. Burrows also stated that Respondent said that "he heard our [Moorefield Police] cases all the time and that if we treated people like he treated – like we treated him today that it makes him question our cases that he comes across." And, Respondent said that the encounter caused him to state something along the lines of having to "maybe reevaluate. Look at our cases." Lt. Burrows stated that Respondent expressed that he was tired of Moorefield police officers "acted like thugs, harassing hardworking people[,]" and that their cases were sloppy. Later, in his testimony, Respondent vehemently denied that he insinuated he would change his rulings on Moorefield Police cases, and likewise denied using the term "thugs" during the call. After the call with Respondent ended, Lt. Burrows testified that she "was certain that our cases were through." At some point during the call,

---

[5] Respondent contends the language he used was that Officer Johnson was "fortunate" to still be a police officer.

Respondent obtained Chief of Police Stephen Riggleman's phone number from Lt. Burrows.

Chief Riggleman was at home in the driveway with his daughter when he received the call. Respondent identified himself as "Judge Carter Williams." He then informed Chief Riggleman that he had just "had words with one of [Chief Riggleman's] boys" and detailed the interaction, letting Chief Riggleman know that he felt very disrespected.

Respondent told Chief Riggleman that the Moorefield police officers are on their phones, and he would be calling the state police if he saw it again and have the officers charged. Chief Riggleman told Respondent that he was at home and if there was an issue with the stop, they could look at the bodycam on Monday. At the time, Chief Riggleman was under the impression that Respondent had been issued a citation he disagreed with. Respondent said that there was no issue with the circuit judge calling the chief of police, that Chief Riggleman was a public servant just like him, and that he could call Chief Riggleman whenever he wanted. To the contrary, Chief Riggleman testified that he had never spoken to Respondent outside the courtroom before and felt disrespected that the first and only time Respondent did speak with, introduce himself, or acknowledge Chief Riggleman as Chief of Police was to call him at home to complain about being stopped. Chief Riggleman testified that Respondent ended the call by hanging up on him, and Respondent admitted to hanging up on him.

8

Respondent then called the former Chief of Police, Steven Reckart, who ended his tenure with the Moorefield Police as a detective. Detective Reckart testified that Respondent called him at home that evening saying that he was upset with Officer Johnson because he had been stopped for a cell phone violation and began detailing to Detective Reckart what had transpired. Respondent told Detective Reckart that Officer Johnson should not be a police officer to start with,[6] again referencing the Mineral County charges. Respondent expressed frustration with the Moorefield Police Department, stating that it was "a bunch of boys being ran by boys and the cases weren't fair to the public." Further, according to Detective Reckart, "[Respondent] was expressing his displeasure in some of the criminal cases that were being brought to his court[,]" and "advised that he [Respondent] had some leeway in some of those cases, but maybe might look at them tighter in the future." Detective Reckart told Respondent that he was retired and could not do anything, but repeatedly asked "Judge, what would you like me to do?" Detective Reckart later testified that he believed the purpose of Respondent's call was just to vent or voice his concerns to someone, but testified it was out of the ordinary for Respondent to have called him. Respondent agreed with Detective Reckart's characterization of the telephone exchange, later testifying that he called Detective Reckart to vent and never asked him to take any action. Respondent also vehemently denied saying that he might change his rulings in Moorefield Police cases based on the stop, but Detective Reckart

---

[6] Again, Respondent contends the words he used were to the effect that Officer Johnson was "fortunate" to still be a police officer.

9

executed an affidavit stating that he believed Respondent was biased against the Moorefield Police Department based on his conversation with him on July 11.

Respondent next called Chief Judge H. Charles Carl, III, the Chief Judge of the Twenty-Second Judicial Circuit. Chief Judge Carl testified that Respondent called him at home and detailed the stop. Chief Judge Carl's impression was not that Respondent was trying to get out of a ticket, but that Respondent was upset that Officer Johnson would not take his word for it that he was not on his cell phone and felt Officer Johnson should have done so.

Later that evening, Respondent called Carol Zuber, Moorefield's Mayor and Police Commissioner, from his car parked outside her home and asked if she would speak with him. Mayor Zuber's late husband and Respondent had been friends, so Mayor Zuber testified that she did not think it was out of the ordinary for Respondent to come to her home, but as it was around nine or ten o'clock in the evening, the timing was out of the ordinary. According to Mayor Zuber, Respondent said, " 'I really hate to do this to you with just being taking over Mayor,' but he said, 'You're going to have to do something with your police officers.'" He claimed the officers were kids, had sloppy cases, and were unprepared for court. Respondent told her the circumstances of the stop and said that Officer Johnson had not given him the opportunity to show that he had not been using his cell phone. Specific to Officer Johnson, Respondent told Mayor Zuber that more should have been done to Officer Johnson with respect to the Mineral County incident.

Respondent continued, stating that Officer Johnson had gotten off the hook, that the case could be reopened, and Officer Johnson could be tried again. Respondent admitted discussing the Mineral County incident in the context of Officer Johnson being "lucky to still be on the force" but denied stating or insinuating that he should be recharged. Mayor Zuber testified that Respondent never asked her to have Officer Johnson fired or asked her to do anything about a ticket. Mayor Zuber testified that by the end of her conversation with him, Respondent was calmer and expressed remorse for how he had acted during the stop when Mayor Zuber said she would view the bodycam footage to see if anything was done incorrectly.

## C.    *July 12 to 15, 2021*

On Monday morning, Mayor Zuber called Chief Riggleman and told him that Respondent had been to her home the night before and "made a complaint on Johnson."[7] She asked Chief Riggleman if she could view the bodycam footage on her way to work. In the interim, Officer Johnson, Lt. Burrows, and Detective Reckart had spoken with Chief Riggleman about the incident, so Chief Riggleman put the prosecutor's office on notice of what had happened. Chief Riggleman also had a discussion with Officer Johnson about what had transpired after the stop and the comments made by Respondent to others relative to his employment and the Mineral County charges.

---

[7] Respondent contends he was not "filing a complaint" but rather was venting.

11

After allowing Mayor Zuber to view the bodycam footage, Chief Riggleman met with Prosecutor Lucas See, showed him the footage, and asked him to file a motion to have Respondent disqualified from criminal cases involving the Moorefield Police Department. As a result of the meeting, Prosecutor See advised Chief Riggleman to take statements from Detective Reckart and Mayor Zuber.

Given the sensitivity of the situation involving a judge before whom he appeared every day, Prosecutor See contacted Judge Cookman, a senior status judge, for advice on how to proceed. Judge Cookman advised Prosecutor See to gather all information available and take it to Chief Judge Carl. For that reason, Prosecutor See obtained affidavits from the individuals Respondent had contacted the evening of the stop. Judge Cookman also advised Prosecutor See that the conduct needed reported to the appropriate ethics authorities. Prosecutor See contacted Chief Judge Carl to advise him of the situation and Chief Judge Carl suggested that Prosecutor See speak with Respondent. After that, Prosecutor See received a call from Respondent asking to meet.

At that meeting, Respondent told Prosecutor See that he wished to apologize to Officer Johnson and to Chief Riggleman and asked if Prosecutor See could facilitate that. However, Respondent also stated that Officer Johnson should not be on the force. Prosecutor See told Respondent he intended to report the conduct from July 11. Respondent stated he would self-report. Respondent asked Prosecutor See what he should have done, and Prosecutor See told Respondent he should have been given a ticket and

12

should not have identified himself as a judge. Prosecutor See notified Respondent that there were concerns of bias against the Moorefield Police Department. Respondent voluntarily disqualified himself from its cases by switching criminal dockets with Judge Carl, making the motion for disqualification unnecessary.

Chief Riggleman issued a backdated citation to Respondent for driving on an expired license and for use of a cell phone while driving. Respondent pleaded no contest to driving on an expired license and the cell phone charge was dropped.[8] Magistrate Craig Allen Hose, who serves Hardy County, accepted the no-contest plea. Both Prosecutor See and Magistrate Hose testified they saw no cause to take the plea to a different magistrate since the matter was not in dispute.

Respondent called the Judicial Disciplinary Counsel to self-report on July 15, 2021. During that call, he expressed remorse for his actions, noting that he acted out of unjustifiable anger and was self-reporting to "fall on [his] sword." At the time of Respondent's self-report, JDC had already opened a complaint. Respondent agreed that he self-reported in response to his discussion with Prosecutor See about reporting, but also in response to it coming to his attention that there were concerns about him presiding over

---

[8] Chief Riggleman later testified that there was no evidence Respondent was using his cell phone.

13

Moorefield Police cases. JDC launched an investigation, interviewing the various individuals Respondent spoke with the evening of the traffic stop and Prosecutor See.

### D. Earlier Traffic Stops

During its investigation, JDC became aware of Respondent's other traffic stops. Officer Johnson had previously interacted with Respondent when pulling him over for running a stop sign in January 2020. Respondent also identified himself as a judge during that stop, and Officer Johnson did not issue him a ticket. On that occasion, Officer Johnson testified that Respondent was polite.

Corporal Eric Vaubel testified that Respondent had been through a DUI checkpoint in the summer of 2020. Corporal Vaubel did not recognize Respondent, but Respondent identified himself as Judge Williams. As Respondent exhibited no signs of impairment, Trooper Vaubel sent him on his way. Respondent later admitted that he may not have been wearing a seatbelt at the time of that stop.

Corporal Vaubel also pulled Respondent over for an expired registration in April 2021. On that occasion, Respondent's registration had been expired since the previous November. Respondent did not identify himself as a judge, but Corporal Vaubel recognized him. Respondent asked Corporal Vaubel why he did not just come to him in court and tell him the registration was expired, to which Corporal Vaubel responded that he did not have access to Respondent to do that. Respondent was issued a warning and

14

renewed his registration, but Corporal Vaubel did not inform Respondent that his license was expired. Corporal Vaubel testified that his interactions with Respondent were always cordial.

In the late spring of 2021, Trooper Benjamin Thorn pulled Respondent over for not wearing a seatbelt. Trooper Thorn did not immediately recognize Respondent because he was in painting clothes, and Respondent did not identify himself as judge. Trooper Thorn was on "Click-it-or-Ticket" patrol and is "pretty much expected" to write seatbelt tickets but did not issue Respondent a ticket because he "didn't really see a need to stir up the hornet's nest for such a minor violation[.]" Trooper Thorn further noted that he did not write a ticket because he "ha[s] felony cases in front of [Respondent] in Circuit Court that he rules on." And, "[u]ltimately [Trooper Thorn] care[d] about those felonies more" so, he reasoned, "keep the judge happy and my cases will – you know, because he has a lot of discretion in things." Because Trooper Thorn knew he was going to extend Respondent a professional courtesy, he let Respondent go relatively quickly and did not inform Respondent that his license had expired. Like Corporal Vaubel, Trooper Thorn stated that Respondent was cordial and polite.

### E.   *October 2021: Formal Statement of Charges*

On October 25, 2021, JIC issued a formal statement with eleven separate charges. The first pertains to Respondent's interaction with Officer Johnson and his call with Lt. Burrows during the stop as well as the expired license and cell phone charges.

Charge I alleges that those facts established Respondent violated Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.2 (Impartiality and Fairness); 2.3 (A) and (B) (Bias, Prejudice, and Harassment); 2.8(B) (Decorum, Demeanor and Communication), 2.10(A) (Judicial Statements on Pending/Impending Cases); 2.16(B) (Cooperation with Disciplinary Authorities); 3.1 (A), (B), (C), and (D) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge II is based on Respondent's phone call to Chief Riggleman and alleges those facts established violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.3 (A) and (B) (Bias, Prejudice, and Harassment); 2.8(B) (Decorum, Demeanor and Communication); 3.1(C) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge III relies on Respondent's phone call to Detective Reckart and alleges those facts established violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 2.2 (Impartiality and Fairness); 2.3 (A) and (B) (Bias, Prejudice and Harassment); 2.8(B) (Decorum, Demeanor and Communication); 2.10(A) (Judicial Statements on Pending/Impending Cases); 3.1(C) (Extrajudicial Activities in General) of

16

the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge IV pertains to Respondent's call to Lt. Burrows after the stop and alleges those facts established violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.2 (Impartiality and Fairness); 2.3 (A) and (B) (Bias, Prejudice, and Harassment); 2.8(B) (Decorum, Demeanor and Communication); 2.10(A) (Judicial Statements on Pending/Impending Cases); 3.1 (A), (B), (C), and (D) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge V is based on Respondent's visit to Mayor Zuber's home and alleges those facts established violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.2 (Impartiality and Fairness); 2.3 (A) and (B) (Bias, Prejudice, and Harassment); 2.8(B) (Decorum, Demeanor and Communication); 2.10(A) (Judicial Statements on Pending/Impending Cases); 3.1 (A), (B), (C), and (D) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge VI relates to Respondent's interaction with Prosecutor See in relation to the stop, Chief Riggleman's request that a motion for disqualification be filed, and self-reporting. Charge VI also deals with the issuance and resolution of the ticket that was backdated to July 11, 2021. The statement of charges alleges that those facts establish violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.2 (Impartiality and Fairness); 2.3 (A) and (B) (Bias, Prejudice, and Harassment); 2.8(B) (Decorum, Demeanor and Communication); 2.10(A) (Judicial Statements on Pending/Impending Cases); 2.16(A) (Cooperation with Disciplinary Authorities); 3.1 (A), (B), (C), and (D) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a), (c) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge VII pertains to Respondent's traffic stop for running a stop sign, alleging that he admitted he ran the stop sign and identified himself as a judge and was not ticketed. The statement of charges alleges those facts establish violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.2 (Impartiality and Fairness); 3.1(C) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge VIII is based on Respondent's expired registration and interaction with Corporal Vaubel relative to the expired registration as well as the stop at the Click-it-

18

or-Ticket checkpoint, for which Respondent did not receive a ticket. The statement of charges alleges those facts establish violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); and 3.1(C) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge IX relates to Respondent's failure to wear a seatbelt when stopped by Corporal Vaubel at a checkpoint, for which he did not receive a ticket. The statement of charges alleges those facts establish violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.2 (Impartiality and Fairness); and 3.1(C) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge X pertains to Trooper Thorn's stop, where Respondent was not wearing a seatbelt and did not receive a ticket. The statement of charges alleges those facts establish violations of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); and 3.1(C) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a) and (d) (Misconduct) of the Rules of Professional Conduct.

Charge XI alleges a pattern and practice of violating traffic laws and a pattern and practice of using his public office for private gain.

19

*F.*     ***The Wal-Mart Incidents***

During the investigation that resulted in the first statement of charges, JDC also became aware of an incident at Wal-Mart that Chief Riggleman mentioned in passing during his interview. Chief Riggleman relayed to JDC that he did not work up the case but that Detective Reckart had handled an incident several years prior where Respondent had left Wal-Mart without paying for around three hundred dollars of merchandise and that his wife was with him at the time. Detective Reckart relayed similar information but noted several times that he could not remember clearly since it was so long ago. Detective Reckart stated that there was no investigation of the incident, he was just doing other normal investigations when Christine Crites, the asset protection associate at Wal-Mart, told him about the incident. Ms. Crites had reached out to Respondent, and he had returned to the store and paid for the merchandise.

JDC contacted Ms. Crites regarding the incident, which occurred in 2019 or 2020.[9] She recalled that an associate spoke to Respondent while he was checking out and distracted him. Ms. Crites also reported that there was a receipt in the machine, and that Respondent took the receipt before leaving the store with the merchandise, apparently believing it was his. Ms. Crites recognized that it was Respondent and called him to let him know what had happened. He was "mortified" and came to Wal-Mart within the hour to pay for the items. She had determined he was "100 percent" distracted and that it was

---

[9] As noted below, there are discrepancies as to the dates of the first incident.

20

clearly accidental, which "happens more than you would think." She further noted that it is easy to tell when someone does it by accident or when they are trying to steal.

When JDC asked Respondent about the Wal-Mart incident, he confirmed that he had accidentally left without paying for the merchandise because he was distracted speaking with one of the associates and took a receipt thinking it was his when it was not. But he disputed that his wife was with him and said that the amount was fifty-two dollars. He confirmed Ms. Crites's statement that he returned to Wal-Mart and paid for the items as soon as he was made aware of his mistake. JDC opted not to pursue any disciplinary charges based on the 2019 Wal-Mart incident.

Though Respondent had been asked about the 2019 Wal-Mart incident during his interview with JDC, he did not disclose that he accidentally left Wal-Mart without paying a second time in August 2021. When Ms. Crites reviewed the tape after the 2021 incident, she readily determined it was accidental. The tape showed Respondent talking to someone in the self-checkout, becoming distracted, and leaving without paying. Chief Riggleman was at Wal-Mart for a separate incident, and Ms. Crites asked him if the video did, in fact, depict Respondent as opposed to his brother. Although Ms. Crites informed Chief Riggleman that she would not be pressing charges against Respondent

21

because it was obviously an accident, Chief Riggleman was "pretty insistent" that she put together the information for him.[10]

Chief Riggleman said he would contact Respondent and approached Prosecutor See about the issue. Ms. Crites did not personally reach out to Respondent as she had previously because Respondent had recently been involved in the traffic stop incident with Officer Johnson, and she did not want Respondent to stop shopping at Wal-Mart. Prosecutor See then contacted Respondent to relay that he had inadvertently failed to pay for the merchandise, and Respondent advised that he wished to pay for the items. Prosecutor See offered to pick up the money and take it to Wal-Mart since Respondent had Covid-19 at the time, and Respondent took Prosecutor See up on that offer.

## G. February 2022: Second Formal Statement of Charges

As a result of the second Wal-Mart incident in August 2021 and Respondent's failure to disclose it to JDC, JDC issued a second statement of charges. The second statement of charges alleges that Respondent had left Wal-Mart without paying in August 2021 and noted the prior incident, referencing both a 2020 date and a 2019 date. Respondent exchanged several messages with Ms. Crites about paying for the items, and those messages appear to establish that the first incident occurred in 2019, but Ms. Crites

---

[10] We note this only to dispel the notion that Wal-Mart called the police department to file a complaint as the evidence before us clearly demonstrates there was no intent on the part of Wal-Mart to press charges.

did not have a record for that date. Related to that 2019 incident, the statement of charges alleges that there was approximately three hundred dollars of merchandise and that Respondent's wife was with him. The charge further alleges that Respondent failed to disclose the August 2021 incident, and detailed the circumstances of Prosecutor See facilitating payment to Wal-Mart. The statement of charges includes a single charge (Charge XII) and concludes that the facts as alleged establish a violation of Rules 1.1 (Compliance With the Law); 1.2 (Confidence in the Judiciary); 1.3 (Avoiding Abuse of the Prestige of Judicial Office); 2.16(A) (Cooperation with Disciplinary Authorities); and 3.1(C) (Extrajudicial Activities in General) of the Code of Judicial Conduct as well as Rules 8.4(a), (c), and (d) (Misconduct) of the Rules of Professional Conduct.

In response to the second statement of charges and subsequent publicity about it, Ms. Crites called JDC to note her concerns that the charges falsely made it appear as though Respondent had shoplifted.[11] Ms. Crites also took issue with the charge asserting it was three hundred dollars of merchandise, stating that the amount was closer to thirty dollars than to three hundred. JDC responded that it simply relayed the allegations from other witnesses, and that the amount was "in dispute." JDC further responded that it could not control the way the media characterized the incident, but that JDC understood "it wasn't a shoplifting, because [Ms. Crites] clearly said, and it looked like on the video, he had no

---

[11] The call between the investigator for JDC and Ms. Crites was recorded and a transcript of the call is in the record.

23

intent[.]" Ms. Crites was concerned that the charges made it appear that she had let Respondent go for shoplifting and would be hamstrung in the future in prosecuting those individuals who had actually shoplifted, and clarified that "if it had looked like he had intentionally shoplifted, I would've charged him the same as anyone else." JDC's general response was that the newspapers often get things wrong, and by virtue of the fact Respondent is a judge, his extrajudicial activities are subject to public scrutiny.

## H.    Hearing and Recommended Decision

Respondent and JDC engaged in discovery and the two complaints were consolidated for hearing before the Judicial Hearing Board. The JHB conducted a three-day hearing beginning on June 14, 2022, during which it reviewed over eighty-five exhibits and heard the testimony of more than two dozen witnesses. The parties submitted proposed findings of fact and conclusions of law, and the JHB issued its unanimous recommended decision on September 22, 2022.

In its recommended decision, the JHB found that Charges I-XI[12] were sustained by clear and convincing evidence, with qualifications. First, the JHB did not find clear and convincing evidence relating to Respondent's violation of the cell phone statute,

---

[12] The recommended decision misnumbers the later charges, seemingly combining the two similar seatbelt charges. That resulted in Charge X as the pattern or practice charge when that was Charge XI in the first charging document. The recommended decision then treats the Wal-Mart charge as Charge XI. We will treat the pattern and practice charge as Charge XI and the Wal-Mart charge as Charge XII.

24

the use of "boy," or Respondent grabbing his driver's license out of Officer Johnson's hand with respect to Charge I. As to Charge II, the JHB did not find clear and convincing evidence as to Respondent's violation of the cell phone statute or that Respondent hung up on Chief Riggleman. As to Charge XI, the JHB concluded that there was clear and convincing evidence of Respondent's use of his public office for private gain to avoid traffic tickets, but no clear and convincing evidence of a pattern or practice of violating traffic laws. The JHB did not find clear and convincing evidence to establish Charge XII.

Matching those factual findings to violations of the Code of Judicial Conduct, the JHB found that Respondent had violated the following rules of Judicial Conduct by clear and convincing evidence:

Rule 1.1 requires judges to comply with the law.[13] The JHB concluded Respondent violated Rule 1.1 by driving on an expired license at the time of the subject traffic stop and having, on other occasions, failed to comply with the law relative to the operation of motor vehicles.

---

[13] Rule 1.1: "A judge shall comply with the law, including the West Virginia Code of Judicial Conduct."

25

Rule 1.2 requires judges to act in a manner that promotes public confidence in the judiciary and to avoid impropriety and the appearance of impropriety.[14] The JHB concluded Respondent violated this rule by making threats to use his power as a judge to retaliate for the traffic stop.

Rule 1.3 prohibits the abuse of the prestige of judicial officer to advance personal or economic interests of the judge or others.[15] The JHB concluded Respondent violated this rule by using or attempting to use the prestige of his office to advance his personal interests relative to traffic stops.

Rule 2.8(B) requires a judge to maintain patient, dignified, and courteous communication with those he or she deals with in an official capacity.[16] The JHB

---

[14] Rule 1.2: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety."

[15] Rule 1.3: "A judge shall not abuse the prestige of judicial office to advance the personal or economic interests of the judge or others, or allow others to do so." Importantly, Comment 1 to Rule 1.3 states, in relevant part,

> It is improper for a judge to use or attempt to use his or her position to gain personal advantage or deferential treatment of any kind. For example, it would be improper for a judge to allude to his or her judicial status to gain favorable treatment in encounters with traffic officials.

[16] Rule 2.8(B): "A judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, court staff, court officials, and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, court staff, court officials, and others subject to the judge's direction and control."

concluded Respondent violated this rule by invoking his judicial office in a manner that was less than patient, dignified, and courteous with the traffic officer, the officer's supervisor, the police chief, the former police chief, and the mayor.

Rule 2.10(A) prohibits judges from making public statements that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court and from making any nonpublic statement that might substantially interfere with a fair trial or hearing.[17] The JHB concluded Respondent had violated Rule 2.10(A) by implying that he might make rulings in cases involving the Moorefield police that were influenced by his grievances with Officer Johnson.

Rule 3.1 relates to extrajudicial activities.[18] When engaging in extrajudicial activities, Rule 3.1, in relevant part, prohibits judges from participating in activities that

---

[17] Rule 2.10(A): "A judge shall not make any public statement that might reasonably be expected to affect the outcome or impair the fairness of a matter pending or impending in any court, or make any nonpublic statement that might substantially interfere with a fair trial or hearing."

[18] Rule 3.1:

A judge may engage in extrajudicial activities, except as prohibited by law or this Code. However, when engaging in extrajudicial activities, a judge shall not:

(A) participate in activities that will interfere with the proper performance of the judge's judicial duties;

would (A) interfere with the proper performance of the judge's duties; (B) lead to frequent disqualification; (C) appear to a reasonable person to undermine the judge's independence, integrity, or impartiality; and (D) appear to a reasonable person to be coercive.

The JHB concluded that Respondent violated Rule 3.1(A) and (B) because the implication that his rulings might change because of the traffic stop resulted in his disqualification from criminal cases involving that police department and interfered with the proper performance of the judge's judicial duties. The JHB concluded Respondent violated Rule 3.1(C) because Respondent implying that his rulings in Moorefield Police cases could be influenced by his grievances with being pulled over would appear to a reasonable person to undermine the Respondent's independence, integrity, or impartiality. And, the JHB concluded Respondent violated Rule 3.1(D) because he contacted Officer Johnson's supervisor, the chief of police, the former chief of police, and the mayor in a

---

(B) participate in activities that will lead to frequent disqualification of the judge;

(C) participate in activities that would appear to a reasonable person to undermine the judge's independence, integrity, or impartiality;

(D) engage in conduct that would appear to a reasonable person to be coercive; or

(E) make use of court premises, staff, stationery, equipment, or other resources, except for incidental use for activities that concern the law, the legal system, or the administration of justice, or unless such additional use is permitted by law.

way that a reasonable person would find coercive, and Lt. Burrows interpreted the contact during the stop as a request by Respondent not to be issued a ticket.

Finally, because Respondent is a lawyer and therefore subject to the Rules of Professional Conduct, the JHB found that Respondent violated Rule 8.4(d), which prohibits conduct prejudicial to the administration of justice.[19] The JHB based that conclusion on Respondent's belligerence with Officer Johnson, his contact with Lt. Burrows and other officials suggesting he wanted special treatment and punishment for Officer Johnson, and the suggestion his rulings in future cases might be influenced by the traffic stop.

---

[19] Rule of Professional Conduct 8.4(d) states that it is professional misconduct for a lawyer to: "(d) engage in conduct that is prejudicial to the administration of justice[.]"

The JHB did not find clear and convincing evidence that Rules 2.2,[20] 2.3(A),[21] 2.3(B),[22] or 2.16[23] of the Code of Judicial Conduct had been violated, nor did it find a violation of Rules 8.4(a)[24] or (c)[25] of the Rules of Professional Conduct.

Where the JHB did find violations, it found that there were relatively few aggravating factors. The JHB found it an aggravating factor that the conduct was not confined to the length of the traffic stop but continued for hours after Respondent had time for reflection, and that there were several separate acts of misconduct. As to mitigating

---

[20] Rule 2.2: "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially."

[21] Rule 2.3(A): "A judge shall perform the duties of judicial office, including administrative duties, without bias or prejudice."

[22] Rule 2.3(B):

> A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, or engage in harassment, including but not limited to bias, prejudice, or harassment based upon race, sex, gender, religion, national origin, ethnicity, disability, age, sexual orientation, marital status, socioeconomic status, or political affiliation, and shall not permit court staff, court officials, or others subject to the judge's direction and control to do so.

[23] Rule 2.16(A) provides: "A judge shall cooperate and be candid and honest with judicial and lawyer disciplinary agencies."

[24] Rule of Professional Conduct 8.4(a) provides that it is professional misconduct for a lawyer to "violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another[.]"

[25] Rule of Professional Conduct 8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation[.]"

factors, the JHB noted that Respondent had no other disciplinary complaints, Respondent presented evidence regarding some medical and other issues he was suffering at the time of the misconduct, which he took steps to address, and Respondent had expressed "some" remorse.

The JHB analogized the circumstances to *Matter of Ferguson*,[26] and recommended the following sanctions: (1) Respondent be suspended for a period of one year, with three months of the suspension served without pay; the remainder of the suspension be stayed pending the Respondent's supervised probation under the terms of his contract with JLAP and reimposed upon violation; (2) Respondent be fined $5,000 for multiple violations of the Code of Judicial Conduct and the Rules of Professional Conduct; (3) Respondent be censured for multiple violations of the Code of Judicial Conduct and the Rules of Professional Conduct; and (4) Respondent pay the costs of the proceedings in the amount of $11,129.06, as well as additional costs incurred and awarded as deemed appropriate by this Court. Both parties filed objections to the recommended decision and sanctions.

## II.    STANDARD OF REVIEW

"The purpose of judicial disciplinary proceedings is the preservation and enhancement of public confidence in the honor, integrity, dignity, and efficiency of the

---

[26] 242 W. Va. 691, 841 S.E.2d 887 (2020).

members of the judiciary and the system of justice."[27]   This Court lends substantial consideration to the factual determinations made by the JHB.   But, "[t]he Supreme Court of Appeals will make an independent evaluation of the record and recommendations of the Judicial [Hearing] Board in disciplinary proceedings."[28]   We review the record before the JHB for clear and convincing evidence that a violation has occurred:

> '"Under [Rule 4.5 of the West Virginia Rules of Disciplinary Procedure], the allegations of a complaint in a judicial disciplinary proceeding 'must be proved by clear and convincing evidence.'" Syllabus Point 4, *In Re Pauley*, 173 W.Va. 228, 235, 314 S.E.2d 391, 399 (1983).' Syllabus Point 1, *Matter of Hey*, 192 W.Va. 221, 452 S.E.2d 24 (1994).[29]

Inclusive of that review is the prerogative to accept or reject the disciplinary sanction recommended by the JHB.[30]   With these standards and goals in mind, we turn to the parties' objections to the recommended decision.

### III.   ANALYSIS

JDC generally agrees with the findings of fact and conclusions of law reached by the JHB but takes issue with five components of the recommended decision. First, JDC contends it proved by clear and convincing evidence that Respondent's use of

---

[27] Syl., *In the Matter of Gorby*, 176 W. Va. 16, 339 S.E.2d 702 (1985).

[28] Syl. Pt. 1, *W. Va. Judicial Inquiry Comm'n v. Dostert*, 165 W. Va. 233, 271 S.E.2d 427 (1980).

[29] Syl. Pt. 1, *Matter of Starcher*, 202 W. Va. 55, 501 S.E.2d 772 (1998).

[30] *In re Crislip*, 182 W. Va. 637, 638, 391 S.E.2d 84, 85 (1990).

"your boy" or "boy" gives rise to the appearance, however incorrect, that Respondent is biased against African-Americans and/or young people. Second, JDC contends that it proved by clear and convincing evidence that Respondent engaged in wrongdoing at Wal-Mart, received preferential treatment, and lacked candor by neglecting to report the second incident. Third, JDC takes issue with the individual factual findings in Charges I, II, and XI, contending that there was sufficient evidence to establish that Respondent grabbed his license from Officer Johnson during the stop, hung up on Chief Riggleman, and engaged in a pattern or practice of misconduct by violating traffic laws three times in four months. Fourth, JDC argues that there are some internal inconsistencies in the recommended decision that factually establish violation of Rules 2.16(A) of the Code of Judicial Conduct without corresponding violation of 8.4(c) of the Rules of Professional Conduct. Similarly, JDC argues that the JHB should have found violation of Rule 8.4(a) of the Rules of Professional conduct because it found a violation of Rule 8.4(d). Finally, JDC seeks a harsher punishment than that recommended by the JHB.

Respondent concedes that his traffic violations violated Rule 1.1 of the Code of Judicial Conduct but argues that all remaining charges should be dismissed because this was a purely personal and extrajudicial encounter, and that the JDC is punishing him for challenging the traffic stop which, in turn, violates his First Amendment rights. Second, Respondent takes issue with the recommended decision as conclusory; he interprets the events of July 11 as a constitutionally-protected challenge to the traffic stop, rather than conduct subject to punishment under the Code of Judicial Conduct and/or Rules of

33

Professional Conduct. Third, Respondent argues that the JHB erred in relying on *Matter of Ferguson* because his conduct was distinguishable, and further contends the JHB erred in failing to appropriately consider mitigating factors and credit them in the recommended sanctions.

### A. *Misconduct of Judges and the First Amendment*

Because Respondent's contention that the traffic stop on July 11 was a "purely personal and extrajudicial encounter" protected by the First Amendment would result in dismissal of all of the charges, we begin there. This argument was only raised generally in Respondent's first answer and comprised only a few paragraphs of Respondent's voluminous brief before this Court. However, we ascertain from the questioning below that Respondent's argument is grounded in his interpretation that the entirety of the stop, the calls made thereafter, and his interaction with Prosecutor See on the following Wednesday were merely a "challenge" to the propriety of the stop and he was acting in his capacity as an accused, not a judge.

Of course, we are not a police state – one is permitted to question why he is being pulled over and to contest a ticket if he believes he has done nothing wrong. Judges do not lose all First Amendment protections when taking the robe. But, as we explained in *Matter of Hey,* there are significant limitations to that free speech that come with being a member of the judiciary because a judge's speech may impugn the credibility, impartiality, and integrity of the third branch:

34

> The State has compelling interests in maintaining the integrity, independence, and impartiality of the judicial system—and in maintaining the appearance of the same—that justify unusually stringent restrictions on judicial expression, both on and off the bench. As the Fifth Circuit Court of Appeals has noted, a "state may restrict the speech of elected *judges* in ways that it may not restrict the speech of other elected officials." *Scott v. Flowers*, 910 F.2d 201, 212 (5th Cir.1990), *citing Morial v. Judiciary Comm'n*, 565 F.2d 295 (5th Cir.1977) (en banc), *cert. denied*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). (Emphasis in original).[31]

In that case, this Court concluded that the specific prohibitions in the Code of Judicial Conduct adequately balance the "the State's interests in maintaining and enforcing the judicial canons against judges' speech."[32]  In *Hey*, the respondent made public remarks on a radio show commenting on his own disciplinary proceedings.[33]  This Court dismissed the charges, noting that he was acting in his capacity as an accused commenting on his own proceedings, not proceedings that were pending or impending before him as a judge.[34]  The Court further concluded that his remarks did not violate any of the specific prohibitions in the Code of Judicial Conduct and were a matter of public concern.[35]  Respondent likens his circumstances to *Hey*, arguing that the conduct occurred

---

[31] 192 W. Va. 221, 227, 452 S.E.2d 24, 30 (1994).

[32] *Id.* at 228, 452 S.E.2d at 31.

[33] *Id.* at 224, 452 S.E.2d at 27.

[34] *Id.* at 228, 452 S.E.2d at 33.

[35] *Id.*

on a weekend, and he was acting in his capacity as an accused in challenging what he believed to be an ill-founded ticket (despite agreeing there was reasonable suspicion for the stop and that he had violated the law by driving on a suspended license).

Important for our purposes, *Hey* discusses that "judges (like anyone else) have a right to be obnoxious in their public expression. They may continue to offend so long as they refrain from violating specific provisions of the Code [of Judicial Conduct] or some other law."[36] For that reason, protected speech not addressed by the Code of Judicial Conduct, no matter how obnoxious or offensive, is addressed through the ballot box, not disciplinary proceedings.[37] Inconvenient to Respondent's argument, however, the Code of Judicial Conduct has rules aimed at activities and speech both on and off the bench,[38] and the Code of Judicial Conduct works weekends too.

---

[36] *Id.* at 231, 452 S.E.2d at 34.

[37] *Id.*

[38] This point is best illustrated when juxtaposing the JHB's findings as to disqualification from the Moorefield police cases. The JHB did not find that Respondent had violated Rules 2.2 or 2.3(A) because Respondent had not *actually* failed to perform the duties of his judicial office fairly and impartially, nor did he exhibit bias or prejudice in the performance of his judicial duties, but only intimated that he would, in the future, do so. Conversely, the speech at issue *did* violate Rule 3.1, relating to extrajudicial activities, because his conduct interfered with the proper performance of his judicial duties and would have appeared to the reasonable person to undermine the judge's impartiality due to the prospective need for disqualification.

Had Respondent's conduct been limited to loudly contesting whether Officer Johnson read the cell phone statute correctly, we might agree with his position consistent with *Hey* and would defer to the voters in Respondent's district to judge his conduct. But the facts of this case invite a starkly different analysis because the actions of Respondent cannot be understood to be only in his capacity as an accused. Respondent stepped out of the shoes of an accused contesting a stop and into the shoes of a judge upon identifying himself as "Judge Williams" and repeatedly invoking his office on the evening of July 11.

Calling Officer Johnson's supervisor during the stop can only reasonably be interpreted as coercive, and the calls made thereafter were a blatant invocation of his office. Respondent admitted that he called Lt. Burrows "basically to say I didn't do this, I didn't do this. I'm upset about it and could you talk to – could you talk to him or could you call him or could you do something. I did say that. I absolutely did say that." In his sworn statement, Respondent stated:

> Q.   And [Lt. Burrows] told you she would call the officer and tell him not to give you the ticket, correct?

> A.   She said she would call him and talk to him about – yes.

Likewise, in his written self-report, Respondent acknowledged that when he called Lt. Burrows, he "asked that she talk to [Officer Johnson]." Lt. Burrows inferred from the telephone call, as a reasonable person would, that the judge was calling her to get

out of a ticket. This is so despite her testimony that Respondent did not specifically ask her to direct Officer Johnson not to give a ticket. Any reasonable person in Lt. Burrows position would have made the same inference if party to the above call from a judge,[39] received *during* the stop, and relating to an officer over whom she had control. Respondent's refrain that he asked for a ticket is dubious considering that the video shows his tone in doing so was essentially daring Officer Johnson to write him a ticket. Even Respondent acknowledged that he was "smugly" telling Officer Johnson to give him a ticket.

When Respondent called Chief Riggleman, he explicitly called as a "circuit judge" to speak with the Chief of Police. He complained to multiple witnesses that he was upset because he was not afforded the credibility and respect he thought he deserved as a judge. Lt. Burrows testified that Respondent told her "he [had] never been treated so badly as a Circuit Judge and that he couldn't believe that [Officer Johnson] would – wouldn't take his word for it and why he would lie. He's the Circuit Judge." Chief Judge Carl testified that Respondent believed Officer Johnson should have taken his word for it that he was not using his phone. Chief Riggleman and Detective Reckart both testified that Respondent felt he had been disrespected by being pulled over, again, despite

---

[39] We accord little weight to the fact that Respondent had spoken to Lt. Burrows earlier that weekend or Respondent's contention that they were "friends" since neither of Respondent's calls to Lt. Burrows can reasonably be interpreted as a friendly call. In addition, Respondent had never spoken to Chief Riggleman outside the court room and Respondent had only called Detective Reckart on one other occasion.

acknowledging that there was reasonable suspicion for the stop. And, he alluded to his position as judge over Moorefield Police cases in apparent retaliation for the traffic stop. In short, Respondent's conduct was not an invocation of his rights as an accused to challenge a ticket he thought he did not deserve, but an invocation of and abuse of the prestige of his office.

Similarly, *Hey* is not applicable when the speech is prohibited by the Code of Judicial Conduct or when that speech can be viewed as retaliatory and threatening. We therefore find Respondent's argument that he violated *only* Rule 1.1 of the Code of Judicial Conduct for traffic violations because he was exercising his First Amendment rights or because the JHB's recommended decision is based on a misinterpretation of the facts unavailing. We agree with the JHB's view of the evidence and adopt its findings, specifically, that Respondent improperly invoked his office, employed coercive tactics in contacting various public officials that evening, and suggested he might change his rulings in cases in retaliation for the traffic stop. Further, we agree and adopt the JHB's findings that his comments could be interpreted as an attempt to have Officer Johnson fired in retaliation for the stop. So, the JHB's conclusions that Respondent's conduct on July 11 and his interactions with Prosecutor See later that week establish violations of Rules 1.1, 1.2, 1.3, 2.8(B), 2.10(A), 3.1(A), 3.1(B), 3.1(C), 3.1(D) of the Code of Judicial Conduct as well as Rule 8.4(d) of the Rules of Professional Conduct are sound.

**B.** *Inconsistencies in the JHB Recommendation as to Charge VI*

39

Agreeing with those conclusions as we do, we pivot to JDC's argument that the JHB recommendation has some internal inconsistencies. Specifically, JDC argues that the JHB concluded that Respondent had violated Rule 2.16(A) of the Code of Judicial Conduct when he denied that he tried to get Officer Johnson fired and failed to disclose that he had discussed the potential to reinstate criminal charges against him, but did not to make the corresponding finding of dishonesty, deceit, or misrepresentation found in the Rules of Professional Conduct at Rule 8.4(c) and did not make a finding in the conclusions of law section that Rule 2.16(A) had been violated.

The JHB recommendation does find clear and convincing evidence as to Charge VI, which bases violation of Rule 2.16(A) on Respondent's failure to disclose that he had discussed the possibility of reinstating criminal charges against Officer Johnson and his denial that he had tried to get the officer fired. In other charges where the JHB took objection to the factual allegations, those objections were noted. As to Charge VI there were no objections in finding clear and convincing evidence to sustain the charge. Later in the conclusions of law section, the JHB discusses Rule 2.16(A) in relation to lacking candor with disciplinary authorities in failing to disclose the second Wal-Mart incident but does not discuss Charge VI.

We agree with JDC that the factual findings as to Charge VI result in an additional violation of Rule 2.16(A). And, because Rule of Professional Conduct 8.4(c) is violated by conduct that involves "dishonesty, fraud, deceit, or misrepresentation"

40

Respondent has also violated that Rule based on the findings as to Charge VI. Similarly, JDC argues that because the JHB concluded Respondent violated Rule 8.4(d) of the Rules of Professional Conduct, he has also violated Rule 8.4(a) because Rule 8.4(a) is violated if any other provision of the Rules of Professional Conduct has been violated. We agree with JDC that Respondent has also violated Rule 8.4(a).

## C.    *JDC Did Not Meet Its Burden of Proof*

Moving to the remaining charges that the JHB did not find were supported by clear and convincing evidence,[40] we disagree with JDC's position that it met its burden of proof. First, as to the Wal-Mart charge, we find it peripheral to the troubling conduct actually at issue. The evidence clearly demonstrated that on both occasions, Respondent accidentally left Wal-Mart without paying in a self-checkout, as Ms. Crites testified happens often, and as more than one witness in this case testified, they have done, themselves. It is not "preferential treatment" to get out of a shoplifting charge when one did not have the requisite intent to "shoplift" to begin with; the Code of Judicial Conduct

---

[40] We note briefly that we agree with JDC that the allegations that Respondent hung up on Chief Riggleman and grabbed his license from Officer Johnson were established by clear and convincing evidence. Given that those individual factual findings were not dispositive of sustaining the charges against Respondent, we need not examine them in detail. Similarly, the pattern and practice of violating traffic laws is minutia considering that the JHB sustained the charge based on Respondent's pattern and practice of invoking his office to get out of tickets and only one of the encounters was for a moving violation.

does not require Respondent to demand that Wal-Mart or Prosecutor See institute shoplifting charges they know to be frivolous.

There is no appearance of impropriety under these facts, either.[41] Ms. Crites adamantly testified that it was clearly an accident on both occasions, that it was easy to tell when someone was intentionally trying to walk off without paying, and that had Respondent intended to walk off without paying she would have charged him like anyone else. Moreover, Prosecutor See facilitating the payment does not violate the Code of Judicial Conduct considering that Respondent had Covid-19 at the time, wanted to resolve the mistake as soon as possible, and Prosecutor See *offered* to take the funds to Ms. Crites to avoid unnecessary spread of Covid-19.

Similarly, we agree with the JHB that Respondent did not lack candor by failing to disclose the second Wal-Mart incident. JDC's argument in this respect is that

---

[41] JDC relies heavily on the comments to a Youtube video of the Wal-Mart incident as justifying the conclusion that there was an appearance of impropriety. We have reservations as to the probative value, and, frankly, concerns as to the admissibility of the YouTube comments. This issue was raised in a motion in limine below. Judge Lorensen, presiding below, engaged in a thorough discussion of those issues with both JDC and Respondent, JDC's position being that this Court had cited Youtube comments in a previous opinion and Respondent's contention that the commenters could be a bot, or in another country, or might not have watched the video at all and thus authentication was problematic in addition to hearsay concerns. The admissibility of this evidence was waived by Respondent and not raised before this Court. We resist the temptation to rule on issues not properly before us. But we do not rely on the comments, not only because we do not find the comments probative, but also to avoid the appearance that this Court has rubber-stamped their admissibility.

Respondent knew JDC was "interested" in the first Wal-Mart incident because it had asked him about it and if the second incident was no big deal, why not disclose it? This argument presupposes something to hide. Respondent made a mistake, and everyone involved knew it was a simple mistake. Of a 168-page transcript of his interview with JDC, Respondent was asked just four questions about the 2019 Wal-Mart incident. To say that the 2019 Wal-Mart incident was on JDC's radar is fair, but it was barely a blip in the overall scheme such that Respondent did not lack candor for failing to disclose a second incident. That is particularly evident given that Prosecutor See and Chief Riggleman were also aware that JDC was "interested" in the 2019 Wal-Mart incident, and it did not occur to either party to disclose the second incident to JDC either. For those reasons, we do not find clear and convincing evidence that Respondent lacked candor with respect to the Wal-Mart incident.

## C.     *Appearance of Racial Bias*

Next, JDC argues that the JHB should have concluded that it met its burden of clear and convincing evidence that Respondent exhibited the appearance of bias in his use of the phrase "your boy" in his conversations following the traffic stop. Every person Respondent spoke to that evening, including Officer Johnson, testified that they did not understand Respondent to have used the phrase "your boy" to denigrate Officer Johnson based on his race. JDC clarifies that it has never argued that Respondent is racist or racially biased, but that using "your boy" could give the *appearance* of racial bias. We disagree that the appearance of bias based on race was proven with clear and convincing evidence given the attendant facts and circumstances.

43

Initially, we mark a difference between calling Officer Johnson "boy" in place of his name when speaking with him and referring to him as "*your* boy" when speaking with his supervisor and those higher on the chain of command in the context of examining racial bias. The extrajurisdictional case on which JDC relies to establish the appearance of racial bias is readily distinguishable because in that case, the remarks were made from the bench and were not made in isolation but were merely one piece in a litany of other serious racial remarks that painted the use of "boy" in a racial light. Specifically, in *Matter of Cullins*, 481 P.3d 774 (Kan. 2021), a judge, during a bond hearing for a young African-American man had asked whether he was a "Kansas boy."[42] The judge then asked whether he was an athlete, and said "[c]an I take a wild guess? Did you have a felony record before [the school] gave you a scholarship?"[43] The judge then expressed disbelief when the young man said he did not have a felony record and had not been in trouble as a juvenile.[44] The judge's comments gave such an appearance of racial bias that the prosecutor felt compelled to tell the defendant's father that the use of that language would not affect his son's case.[45] We find the context in which "your boy" was used here to be

---

[42] 481 P.3d at 788.

[43] *Id.*

[44] *Id.*

[45] *Id.* at 789.

markedly different and are mindful of the clear and convincing evidence standard in concluding that there was insufficient evidence of racial bias.

As noted above, there is no clear and convincing evidence that Respondent called Officer Johnson "boy" when speaking with him.  While Officer Johnson testified he heard Respondent say something while driving off beginning "next time I see you . . . ." and at the hearing testified that sentence ended "'boy[,]' [s]omething in that nature[,]" Officer Johnson's own written recollection of the incident made immediately afterward, as well as in his sworn statement specifically notes "son."  The "*your* boy" used by Respondent in conversations with Officer Johnson's supervisors refers to him as the Lieutenant's or Chief's "boy" – as though to denote they are Officer Johnson's supervisors. Respondent used the same term to refer to Chief Riggleman and the other Moorefield police officers – none of whom are African-American – when speaking with Detective Reckart and Mayor Zuber detailing that he felt Chief Riggleman and the officers were inexperienced.  For those reasons, we agree with the JHB's conclusion that there is no clear and convincing evidence that Respondent calling Officer Johnson "your boy" to Officer Johnson's supervisors creates an appearance of bias based on race.[46]

---

[46] To the extent JDC argues that "your boy" also creates an appearance of bias based on age, we find that there was also evidence presented that it related to their supervisors (i.e., calling all of Lt. Burrows's patrolmen "[her] boys"; all of Chief Riggleman's patrolmen "[his] boys.").  JDC spent much effort on establishing the appearance of race bias as opposed to age bias to such a degree that the JHB recommended decision does not even make a finding relative to an appearance of age bias.  The brief on appeal suffers from

*E.*	*Sanctions*

Having concluded that Respondent committed multiple violations of the Code of Judicial Conduct and the Rules of Professional Conduct, we turn to the appropriate sanction. The JHB recommended, in part, a suspension for one year, with three months of that suspension to be served without pay and the remaining nine months to be stayed contingent on compliance with Respondent's JLAP contract. JDC argues the recommended sanction is too lenient, asking for a minimum of one year served suspension, while Respondent argues it is too harsh and does not adequately account for mitigating factors. In considering suspension of judges, we have established five factors relevant to determining an appropriate sanction:

> Always mindful of the primary consideration of protecting the honor, integrity, dignity, and efficiency of the judiciary and the justice system, this Court, in determining whether to suspend a judicial officer with or without pay, should consider various factors, including, but not limited to, (1) whether the charges of misconduct are directly related to the administration of justice or the public's perception of the administration of justice, (2) whether the circumstances underlying the charges of misconduct are entirely personal in nature or whether they relate to the judicial officer's public persona, (3) whether the charges of misconduct involve violence or a callous disregard for our system of justice, (4) whether the judicial officer has been criminally indicted, and

a similar infirmity and we find the proof below insufficient to meet the clear and convincing standard. For those reasons, we find JDC has not met its burden of clear and convincing evidence to establish an appearance of age bias.

46

(5) any mitigating or compounding factors which might exist.[47]

We agree with the JHB that the first three factors weigh against Respondent. The substantiated charges directly relate to the administration of justice or the public's perception of the administration or justice, were not entirely personal in nature but involved Respondent's public persona, and involved a callous disregard for our system of justice.

### 1. Mitigating Factors[48]

As to mitigating factors, the JHB recommended decision does not spill much ink on Respondent's proposed mitigating factors, but brevity does not indicate that the JHB did not afford Respondent's mitigating factors their due weight. In fact, the recommended sanction speaks to significant mitigation. First, Respondent has never been disciplined. Consistent with that track record is the testimony of numerous witnesses that Respondent's conduct on July 11 was very out of character. The officers who had previously stopped Respondent, including Officer Johnson, testified that he had been courteous and polite.

---

[47] Syl. Pt. 3, *In re Cruickshanks*, 220 W.Va. 513, 648 S.E.2d 19 (2007).

[48] Due to its medical nature, portions of testimony and exhibits were offered in confidential closed proceedings and/or under seal. We restate that evidence only to the extent necessary to conduct de novo review and to evaluate the parties' objections to the recommended decision with respect to mitigating factors. We further note that Respondent's brief restates or otherwise refers to that evidence and was not filed with any notation of confidentiality.

JDC suggests that this testimony should be discounted because testimony as to his good character was elicited from someone who was either related to him, a personal friend, worked for him, appeared in front of him on a regular basis and/or had cases in his court. To the contrary, who is better suited to give evidence about what behavior is out of the ordinary than those who interact with Respondent daily on a professional and/or personal basis? Moreover, we find the testimony of those individuals, and particularly that of Chief Judge Carl, Prosecutor See, local law enforcement officers, and members of the Bar to be the best evidence of the impact this incident has had on the judiciary. It is certainly more compelling in conducting that evaluation to know what those individuals have observed since the July 11 incident in the workings of the court system than it is to read the comments of a Youtube video or to read opinion-based newspaper articles.

Respondent also presented mitigating evidence that the events of July 11 were a product of mental and emotional health issues he was battling at the time. As we recently discussed in a lawyer disciplinary case, "[w]e consider mental impairments as mitigating factors when medical evidence establishes the mental impairment and that it caused the lawyer's misconduct; the lawyer must also prove a 'meaningful and sustained' rehabilitation period, that he has ceased the misconduct, and that he is unlikely to

reoffend[.]"[49]  As to weight of mitigation, this Court increases mitigation value with the culpability of the mental impairment in causing the misconduct at issue:

> "If the offense is proven to be attributable solely to a [mental] disability ..., it should be given *greatest weight.* If it is principally responsible for the offense, it should be given *very great weight;* and if it is a substantial contributing cause of the offense, it should be given *great weight.* In all other cases in which the [mental] disability ... is considered as mitigating, it should be given *little weight.*"[50]

Respondent likened himself to a powder keg that simply needed a bit of a spark to blow and observed that Officer Johnson happened to be on the receiving end of that. Respondent pleaded human circumstances but recognized that the issues he sought leave for in February 2020 had not resolved and had actually worsened in the aftermath of the brief closing of courts in response to Covid-19, adding a harrying caseload and serious adjustments to an already tenuous mental and emotional health situation. Respondent disclosed those issues to JDC in his self-report and agreed to undergo multi-disciplinary evaluation and treatment at Vanderbilt University (Vanderbilt Comprehensive Assessment Program or VCAP) as part of his referral and participation in JLAP. Respondent agreed to a five-year monitoring agreement. VCAP providers specialize in evaluating the

---

[49] *Lawyer Disciplinary Bd. v. Schillace*, -- W. Va. --, -- S.E.2d (2022) -- (2022 WL 17038201 at *10) (citing *Lawyer Disciplinary Bd. v. Dues*, 218 W. Va. 104, 112, 624 S.E.2d 125, 133 (2005).

[50] *Id.* (quoting *Dues*, 218 W. Va. at 112, 624 S.E.2d at 133) (emphasis in original).

performance of professionals, including lawyers and judges, and is a nationally-recognized program that was on a list of approved providers from JLAP.

Specific to the events of July 11, one of Respondent's physicians testified that Respondent was "introspective" – trying to understand the "why" of his conduct on that date – and that the symptoms of his health issues include irritability and anger that can be managed with increased dosages of prescribed medication. Similarly, in evaluating Respondent's conduct on July 11 in relation to his diagnoses, another physician, Dr. Finlayson, testified that Respondent's inability to regulate his reaction could have contributed to his behavior that night, explaining why Respondent could not "let it go" despite the stop not even resulting in a ticket.

Respondent also put forth evidence relating to a "black box" warning on a medication he was taking at the time that cautions against serious neuropsychiatric events that could result from use of the medication. One of Respondent's physicians testified that he could not attribute the July 11 conduct to that medication. Respondent's other physician testified that it could have been the medication but could also have simply been anger. In our review of the testimony and evidence, we do not lend much weight to explaining away Respondent's conduct on July 11 by use of the black box warning, but we do conclude that Respondent's mental health state at the time primed his conduct on July 11 and afford that state its due in weighing mitigating factors against aggravating ones.

50

As to Respondent's JLAP participation, the JLAP Director, Respondent's JLAP peer monitor, and his health care providers testified that Respondent's rehabilitation efforts are ongoing but exemplary and that Respondent has embraced the opportunity. According to Respondent's peer monitor, Respondent is not just going through the motions – he is treating the programming with seriousness and dedication.

## 2. *Aggravating Factors*

As to aggravating or compounding factors, the JHB found "relatively few." First, Respondent's conduct was not limited to the stop, but continued for hours later into the evening, and, indeed, continued several days later in Respondent's discussion with Prosecutor See. Second, Respondent committed multiple violations, and "[t]o hold a violator of the Code of Judicial Conduct who has committed only one offense to the same exact standard and subject that offender to the same sanctions as a violator who has committed four, five, or fifty separate acts of misconduct would suggest unreasonable disparate treatment[.]"[51] We agree that both of those indicate an aggravating circumstance, although we note that while Respondent's conduct did last for several hours and progress into the following days, it involved the same general event and Respondent's apparent inability to "let it go." The acts of misconduct were separate insofar as Respondent involved different individuals, but the substance of the underlying misconduct is substantially similar. But when considering the other traffic stops during which

---

[51] *In re Toler*, 218 W. Va. 653, 661, 625 S.E.2d 731, 739 (2005).

Respondent invoked his office and did not receive a ticket, it is apparent that there were several independent instances of misconduct.

Identifying himself as judge at the traffic stops is particularly enlightening in determining the appropriate sanction here, because, unlike the JHB, we do not find it a mitigating factor that Respondent has shown "some remorse." To the contrary, it is incumbent upon us to draw a distinction between showing remorse or embarrassment for behaving a certain way and acknowledging wrongdoing. Respondent has admitted only that he violated Rule 1.1 of the Code of Judicial Conduct for committing traffic violations. He refuses to even acknowledge that he violated Rule 1.3 at the various traffic stops where he identified himself as a judge upon being stopped and did not receive a ticket when he had actually committed an offense. He does so despite admitting that he committed the offenses and admitting that he identified himself as a judge, and in the face of Comment 1 to Rule 1.3, which states, by way of example, "it would be improper for a judge to allude to his or her judicial status to gain favorable treatment in encounters with traffic officials."

We commend Respondent on the significant steps he has taken in addressing his mental health issues and the undisputed commitment with which he has approached his JLAP program, which we believe to be a vital resource for our lawyers and judges. We believe that Respondent has addressed or is taking steps to address the underlying issues that, in some part, contributed to his unbecoming behavior on July 11. But Respondent has not come before this Court pleading that he was unwell and that he understands that his

52

conduct violated the Code of Judicial Conduct, and he will not do so again. Except admitting to traffic violations, to this day Respondent does not believe he committed any violations of the Code of Judicial Conduct or the Rules of Professional Conduct.[52]

Respondent repeatedly relied on the redemptive notion that he told Officer Johnson again and again to give him a ticket when there can be no question that it was in a goading manner to test whether Officer Johnson had the audacity to ticket him. Further, Respondent could not or would not grasp that his calls during and after the stop were coercive and retaliatory. In such a circumstance, the failure to acknowledge the wrongful nature of his conduct is a significant factor to consider, and we conclude that it justifies a harsher sanction than that imposed by the JHB.

### 3. *Appropriate Sanction*

The JHB's sanction was based, in part, on the sanction fashioned in *Matter of Ferguson*.[53] In that case, a magistrate had violated a state fishing regulation and displayed his Supreme Court identification card to allude to his status as a magistrate.[54] He was belligerent and, at times, threatening to the Department of Natural Resources Officers and denied during the investigation that he acted in a disrespectful and coercive

---

[52] We recognize that Respondent sent a letter to Officer Johnson and Chief Riggleman to apologize for his behavior toward them.

[53] 242 W. Va. 691, 841 S.E.2d 887 (2020).

[54] *Id.* at 694, 841 S.E.2d at 890.

manner in suggesting he would contact the officers' supervisors.[55]  In sanctioning the magistrate with 90 days' suspension without pay, imposing a $2,000 fine, and assessing costs, this Court paid particular mind to the fact that it occurred in the context of a law enforcement matter.[56]  Here, too, the presumption of preferential treatment in law enforcement matters over which judges preside daily is a display of arrogance repugnant to the fair administration of justice.

While *Ferguson* is instructive, we reject the argument advanced by JDC that our judicial disciplinary sanctions are limited based on that case, or any other.  As in the comparison between this case and *Ferguson*, circumstances assessed in these types of cases are rarely apples to apples and do not lend themselves to floor-and-ceiling-type analyses. Indeed, the JHB recognized that "[m]atters of suspension due to accusations of judicial misconduct are reviewed and decided based on the unique facts and circumstances of each case."[57]  And, while some conduct here is more aggravated than in *Ferguson*, namely that Respondent's comments ventured past coercion into retaliation and were made to multiple parties, there are some factors present in *Ferguson* that are not present here.  Most prominently, *Ferguson* did not have the background contribution of mental health issues. In making an independent review of the record and considering the seriousness of

---

[55] *Id.* at 700-01, 841 S.E.2d at 896-97.

[56] *Id.* at 701, 841 S.E.2d at 897.

[57] *In re Fouty*, 229 W.Va. 256, 260, 728 S.E.2d 140, 144 (2012) (citation omitted).

Respondent's misconduct, we conclude that the JHB's recommended sanction should be increased to a six-month suspension without pay. The JHB recommended a one-year suspension, with nine months stayed pending the Respondent's supervised probation under the terms of his contract with JLAP, but the six-month suspension we now impose is strict, with no part suspended. Respondent is required to maintain compliance with the conditions of his JLAP monitoring plan for a period of two years. We find the imposition and stay of a suspension an unnecessary complication when violation of the monitoring agreement is reportable to JIC.

We agree with the JHB's recommendation to censure Respondent and to fine him $5,000. As to costs, we agree that Respondent will bear the costs of these proceedings, with the exception that Respondent is not responsible for the costs associated with Dr. Clayman's review of records as that review of Respondent's VCAP records was conducted without the consent of Respondent and in contravention of the JLAP approved-provider structure. JDC was an approved custodian of the VCAP records because of JIC's relationship to JLAP. We underscore that JLAP is a tool for the JIC whose purpose is to provide evaluations to determine whether there are physical mental, emotional or behavioral health issues capable of rehabilitation that may be a mitigating factor in their investigations. VCAP was selected by Respondent as an approved JLAP provider and the opinions of those providers are not the expert-for-hire views typical in adversarial proceedings, as the JLAP/JIC structure envisions that JLAP is an entity independent from judge or lawyer respondents. Additional expert review may be sought by JDC to address

55

additional areas of specialization, but to the extent JDC in executing its adjudicative functions seeks expert review purely for purposes of refuting the independent evaluations of JLAP-approved providers, we disagree that such costs are appropriately borne by Respondent.

## IV.　CONCLUSION

For the reasons stated above, we impose the following sanctions:

(1) Respondent is suspended from his position as circuit judge in the Twenty-second Judicial Circuit for a period of six months, without pay;

(2) Respondent will maintain compliance with the JLAP monitoring agreement for a period of two years, violation of which is reportable to the JIC;

(3) Respondent is censured;

(4) Respondent is ordered to pay a fine of $5,000; and

(5) Respondent is ordered to pay the costs of this disciplinary proceeding, except that Respondent is not responsible for the costs associated with Dr. Clayman's review of VCAP records.

Six-month suspension without pay and other sanctions ordered.